**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **APRIL KIMBLE,** | ) | |
| | ) | **Civil Action No.:** |
| **Plaintiff,** | ) | **1:19-cv-02549-JPB-JSA** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **QUALITY ASSIST, INC. and** | ) | |
| **TRACEY BANKHEAD** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

There is no evidence that Plaintiff was treated differently by anyone at Quality Assist ("QA") because of her race or her sexual orientation, or that she was subject to any adverse employment actions prior to the termination of her employment. Likewise, there is no evidence to suggest unlawful retaliation, particularly given Plaintiff's admission that she never expressed a belief to anyone at QA that she felt treated differently because she was African American or homosexual. In fact, the indisputable evidence shows that the only person that Plaintiff has accused of discrimination and retaliation (i.e., Defendant Tracey Bankhead) had no input into the decision to terminate her employment and, in fact, saved Plaintiff from being fired more than once. The record evidence also

1

substantiates the fact that Plaintiff's employment with QA ended as a result of her own ongoing work performance deficiencies. For these reasons, summary judgment is appropriate on all counts of Plaintiff's Second Amended Complaint.

## FACTUAL BACKGROUND

Plaintiff began working for QA on September 24, 2015, as a Content Developer II, which was a salaried position. (SUMF ¶¶ 4, 28)  She reported directly to supervisor Tracey Bankhead. (SUMF ¶ 4)  During her first few months of employment (i.e., until approximately December) Plaintiff was assigned to review existing QA courses to learn how they were constructed, organized and formatted. (SUMF ¶59). During that time period she also participated in QA's training course for the Content Team called "Just Right."  (SUMF ¶60).

In January 2016 Plaintiff became responsible for producing the first draft of original course manuscripts for online learning courses, which were subject to pre-established deadlines that were provided well in advance. (SUMF ¶¶ 61, 65)  But, unfortunately, by December 2015 it had already become evident that Plaintiff had problems meeting deadlines. (SUMF ¶66) Thus, the increase in Plaintiff's responsibilities in January was a big concern to the company's CEO, Dr. Annette Sibley, because missed deadlines on manuscripts would create a "domino effect" on an entire project, as a manuscript had to be complete and in final format before

the rest of the team could start their portion of the work on it. (SUMF ¶¶ 64, 67).[1]

For this reason, Dr. Sibley decided that she should step in to assist Ms. Bankhead and provide additional one-on-one support to Plaintiff with the hope of improving her work product and ensuring that projects remained on track. (SUMF ¶ 68). By January, Dr. Sibley was having weekly meetings with Plaintiff, reviewing her work, and providing regular feedback on how to improve. (SUMF ¶¶ 70, 71, 75)   But despite Dr. Sibley's and Ms. Bankhead's efforts in January and February, Plaintiff was still missing deadlines and turning in work that was incomplete and full of errors. (SUMF ¶¶ 72-87)  As a result, Dr. Sibley and Ms. Bankhead had to take time away from their other projects to correct and re-write Plaintiff's submissions. *Id.*  For these reasons, Dr. Sibley was already considering Plaintiff's termination, but she held off because Ms. Bankhead asked her to give Plaintiff a chance to continue working on her skills. (SUMF ¶¶ 140, 141)

On March 4, 2016, Plaintiff was given a performance review.  Dr. Sibley had determined that Plaintiff's work did not merit a pay increase, based on her continued failure to meet deadlines and improve the quality of her work. (SUMF ¶¶ 87, 88)   Ms. Bankhead met with Plaintiff and explained to her why she was not

---

[1] Other members of QA's executive management team had similar concerns regarding Plaintiff's abilities to handle these projects. (SUMF ¶¶ 65, 141)

getting a raise and reiterated the importance of meeting deadlines and submitting work that was complete. (SUMF ¶¶ 89-90, 105).  Plaintiff became very upset about not receiving a raise. (SUMF ¶ 91)  She reacted by immediately sending a letter to Susan Mow, who handled HR matters at QA, wherein Plaintiff expressed her belief that she was entitled to a pay increase, even though her offer letter merely noted that she would be "considered" for one after 6 months at QA. (SUMF ¶¶ 91-94). Dr. Sibley responded to that letter and explained to Plaintiff that she was only offered "consideration" for a pay increase at 6 months, but the deficiencies in her work rendered a raise inappropriate at that time. (SUMF ¶ 95)  Dr. Sibley then agreed that QA would reevaluate the subject at the 12 month point. *Id.*

Going into the spring of 2016, Plaintiff continued to submit incomplete, untimely work that required significant editing. (SUMF ¶¶ 96-99). During that time period Plaintiff's behavior and attitude were noticeably declining. For example, Plaintiff was frequently away from her desk and no one could locate her, and she would fail to show up for meetings that Ms. Bankhead had set up to help Plaintiff improve her work. (SUMF ¶¶ 112-113).  In addition, she was defensive, argumentative, and displayed negative body language when Dr. Sibley pointed out issues with her work during their one-on-one sessions.  (SUMF ¶¶ 106-107).

The situation deteriorated further in May 2016. For example, Plaintiff was

supposed to stay late at the office with Ms. Bankhead on May 9, 2016, to finish an important project that had to be submitted the next day. (SUMF ¶¶ 100-104).  But, even though the work was not completed, Plaintiff decided she was going to leave work to pick up her dog. (SUMF ¶ 105)[2] The next day, while her team was scrambling to finish the project that was due, Plaintiff used her time at the office to send Ms. Mow a condescending email about how she was aware of how to fill out timesheets,[3] after Ms. Mow mentioned an error on one and reminded Plaintiff to put a new date on the form each week.  (SUMF ¶ 110).

Also on May 10th Plaintiff made a point to approach Ms. Mow and claim that she had been working extra hours to "make up" time that she took for lunch breaks.  (SUMF ¶¶ 116)  Prior to this discussion, the only conversation Plaintiff ever had about lunch breaks with a QA supervisor or member of management was in October 2015, when Ms. Bankhead shared her belief and personal practice that a salaried employee was supposed to work an 8 hour day, excluding any time taken

---

[2] Information obtained in discovery shows that Plaintiff clearly was not focused on her work that day, as she had been chatting back and forth with someone that afternoon prior to leaving the office, and was commenting about her "crazy boss" giving her a "ridiculous deadline." *See* SUMF Ex. 13  (Produced by Plaintiff with the file name "5 9 16 Hangout with Jashira Sullivan")

[3] Timesheets were weekly logs used by QA for employees to keep track of time spent on particular client projects. These timesheets did not affect an employee's pay in any way. (SUMF ¶¶ 32, 33)

for lunch.[4]  (SUMF ¶¶ 44-46, 117).  In response to Plaintiff's comments, Ms. Mow assured Plaintiff that she was not being penalized in any way for taking a lunch, and explained that she was not required to make up any time. (SUMF ¶ 118)   Just after speaking with Plaintiff, Ms. Mow spoke with Ms. Bankhead to discuss the issue and clear up any misunderstanding about how QA viewed employees' lunch breaks. (SUMF ¶ 119)  That discussion was the first time in her 19 years at QA that Ms. Bankhead learned that she was mistaken about her long-time practice of not including lunch time as part of an 8-hour work day. (SUMF ¶ 44-46, 120)  As soon as Ms. Bankhead was done speaking with Ms. Mow, she immediately went to Plaintiff and apologized for her mistaken belief about lunch breaks. (SUMF ¶ 120)

Apparently, Plaintiff remained angry even after this resolution of the lunch break issue.  For instance, in an online chat with friends one week later (during work hours), Plaintiff was talking about Ms. Bankhead and the lunch break issue, and stated that "this crazy heffa has been working all these stupid hours for the 19 years she's been working for the company." (SUMF ¶ 111) Plaintiff then stated that she "stopped caring" and bragged that she didn't go to work until 11 a.m.  *Id.*

---

[4] Plaintiff understood the October 2015 conversation with Ms. Bankhead to mean that if she got to work at 9.a.m. and did not take lunch, she should work until 5 p.m., and if she took an hour lunch she should work until 6.p.m. (i.e., 8 hours of "in office" work time each day) (SUMF ¶ 47)

Three days after that (i.e., May 20), Plaintiff emailed Ms. Bankhead to question the mistaken information that was provided 7 months prior about lunch breaks, even though the issue had already been resolved. (SUMF ¶ 121)   In response, Ms. Bankhead asked Plaintiff to come to her office, as she felt it would be better to discuss things in person. (SUMF ¶ 122) Shortly thereafter they had a meeting wherein Plaintiff was agitated and yelling at Ms. Bankhead about lunch breaks, claiming she was being treated "differently" than Ms. Ramey. (SUMF ¶¶ 124). Ms. Bankhead then explained that salaried professionals are not concerned with the number of hours worked each day; they stay until the work gets done. (SUMF ¶125). Plaintiff then stormed out of Ms. Bankhead's office and went to speak with Ms. Mow (SUMF ¶ 131)

When Plaintiff arrived at her office, Ms. Mow was perplexed as to why she was bringing up lunch breaks again, given that the issue had already been settled. (SUMF ¶ 132). During this conversation, VP Kim-Tai. Demars walked by and heard Plaintiff's elevated voice through Ms. Mow's closed office door. (SUMF ¶ 133)  She thought Plaintiff was upset, so she went into Ms. Bankhead's office and asked if she knew what was happening. (SUMF ¶¶ 134)  Ms. Bankhead suggested that Ms. Demars join the meeting in Ms. Mow's office, so she did. *Id.*  Ms. Demars then observed Plaintiff once again claiming that she was working more hours and

was not getting paid for the time she went to lunch. (SUMF ¶¶ 118, 132, 136) During that conversation Ms. Mow repeatedly asked Plaintiff what she would like the company to do to help her and address her concerns, but Plaintiff would not respond. (SUMF ¶ 139). Due to Plaintiff's high level of emotion, Ms. Demars suggested that she go home for the rest of the day so she could calm down and collect herself. (SUMF ¶ 140)

Later that day, Ms. Mow and Ms. Demars spoke with Dr. Sibley (who was out of town) to inform her about the conflict between Plaintiff and Ms. Bankhead, and the subsequent conversation in Ms. Mow's office. (SUMF ¶¶ 143-144) After learning about what had happened and reflecting upon Plaintiff's repeated work deficiencies and failure to improve, as well as Plaintiff's refusal to understand what it meant to be a salaried employee, Dr. Sibley decided that it was time to end Plaintiff's employment. (SUMF ¶¶ 145-148) Dr. Sibley called Ms. Bankhead, Ms. Mow and Ms. Demars over the weekend to inform them of her decision. (SUMF ¶ 145) When Ms. Bankhead was told about the decision, she informed Dr. Sibley that she was still willing to work with Plaintiff, but Dr. Sibley did not change her mind. (SUMF ¶ 151). Dr. Sibley informed Plaintiff that her employment was terminated on May 23, 2016, and explained to her that the ongoing issues with her work were the primary basis for the decision. (SUMF ¶ 155-156)

In late May and June of 2016 Plaintiff and Ms. Mow exchanged emails about Plaintiff's final paycheck and some personal items that remained at QA's office. (SUMF ¶¶ 157-159). At no point during those exchanges did Plaintiff claim she felt discriminated or retaliated against by anyone at QA. *Id.* Instead, Plaintiff went to the EEOC and filled out an Intake Questionnaire wherein she only claimed race discrimination based on allegations that (1) her Caucasian comparator Melissa Ramey was treated better by Ms. Bankhead because she got "paid lunch breaks" and (2) she was fired because she sent an email to Ms. Bankhead about being treated "differently." (SUMF ¶¶ 160-164)  When the EEOC turned that Intake Questionnaire into a Charge of Discrimination, a claim of sexual orientation discrimination magically appeared, but there were no additional alleged acts of discrimination, comparators, or names of persons who supposedly discriminated or retaliated against Plaintiff. *Compare* Pl. Dep. Exs. 3 and 4.

Plaintiff subsequently filed her Complaint, then amended it twice (*See* Docs 1, 23 and 59), which includes claims of discrimination and retaliation based on a myriad of alleged actions that were never cited to the EEOC, and for which Plaintiff has failed to provide evidence of any examples.  Defendants now present their Motion for Summary Judgment, demonstrating why this lawsuit should be dismissed in its entirety.

## ARGUMENT AND AUTHORITY

Plaintiff asserts claims of race and gender/sexual orientation[5] discrimination against QA and Ms. Bankhead based largely on alleged acts for which there is no evidence that they occurred. In fact, she is assuming that her identification as African American and homosexual should automatically lead to the conclusion that she was treated differently at work because of those characteristics.  For example, Plaintiff ignores the evidence of her ongoing performance deficiencies throughout her employment with QA, and speculates that the termination of her employment must have been related to her race.[6]  She further alleges that her termination of employment was also an act of retaliation, despite her admission that she never made a complaint to QA that she felt discriminated against or treated differently because of a protected characteristic. Finally, Plaintiff contends that Ms. Bankhead should be individually liable for race discrimination and retaliation under 42

---

[5] Counts I and II indicate claims based on "sex discrimination, sexual orientation, and gender non-conformity."  The "gender non-conformity" aspect is based on Plaintiff's belief that being homosexual automatically renders her as such. *See* Doc. 59 ¶ 36.  But, that conclusion is contradicted by Plaintiff's assertions that she appears "gender conforming" and "feminine" *See* Doc. 59 ¶¶ 14, 15. Because Plaintiff has failed to distinguish between the theories, Defendants will address the sexual orientation and "gender non-conformity" allegations as one claim. *See Robertson v. Riverstone Cmtys*., LLC, Appeal No. 19-13175, *27 (11th Cir. Mar. 5, 2021)("[A] party is bound by the admissions in his pleadings.")

[6] Plaintiff has not raised an allegation of sexual orientation discrimination related to the termination. *See* Doc. 59; *See also* Pl. Dep., Exs. 3 and 4.

U.S.C. § 1981 ("§1981"), without any evidence that her race was a factor in any aspect of her employment with QA, or that Ms. Bankhead had any involvement in the decision to terminate her  employment.

The truth, as demonstrated by the evidence in the record, is that Dr. Sibley had very legitimate reasons to terminate Plaintiff's employment long before May 23, 2016.  Even after she and Ms. Bankhead spent several months with Plaintiff training her and working one-on-one, Plaintiff continued to repeatedly miss deadlines and turned in incomplete work that had numerous errors.  For many months Dr. Sibley and other members of the QA management team felt that Plaintiff's employment needed to end because she was costing the company time and money. But, Ms. Bankhead intervened with Dr. Sibley to give Plaintiff additional chances to improve. However, when Plaintiff decided to re-hash the already resolved lunch break issue in late May 2016, it confirmed to Dr. Sibley that QA and Plaintiff were never going to be a good fit. Plaintiff just refused to understand that she was a salaried employee and that QA's concern was that her work was on time and completed properly.  So, Dr. Sibley finally decided that it was time for the employment relationship to end.  There is absolutely no evidence to dispute what really happened and, therefore, summary judgment is appropriate on all counts of Plaintiff's Second Amended Complaint.

## I.   <u>The Evidence Does Not Support Any Claims of Discrimination</u>

Plaintiff's claims of race and gender/sexual orientation discrimination are somewhat confusing, as she cites to different factual allegations in three separate Counts of her Second Amended Complaint. *See* Doc 59.[7] For example, Count I asserts a Title VII gender/sexual orientation claim based on allegations that QA (1) "paid similarly-situated gender-conforming, heterosexual employees for lunch breaks while not paying Ms. Kimble's lunch breaks;" (2) did not "mandat[e] that the similarly-situated gender-conforming, heterosexual employees sign in and out at lunch time;" (3) "assist[ed] similarly-situated, gender-conforming, heterosexual employees with their work rather than hypercriticizing them;" and (4) was not "surveilling similarly-situated gender-conforming, heterosexual employees." *Id. at* ¶37.[8]   Count III is a Title VII race discrimination claim based on "discipline and the termination of her employment." *Id.* at ¶ 54. Count V raises another race

---

[7] Ms. Bankhead is the only person Plaintiff has accused of discrimination. *See, generally,* Doc. 59; Kimble Dep. Ex. 4 (PL00007), Ex. 5, Ex. 8 (at pp. 6 and 7).

[8] Plaintiff's allegation that she was treated differently regarding lunch breaks based on her sexual orientation (Doc. 59 ¶37) does not fit within her own timeline. Specifically, while she claims that the purported gender/sexual orientation discrimination began just after the holiday party in December (*See* Doc. 59 ¶ 16), the issue regarding lunch breaks originated in October 2015 (i.e., at least 2 months prior). (SUMF ¶ 423, 117).  Likewise, the time frame of any other gender/sexual orientation claims must be limited to <u>after</u> the December 2015 holiday party based on Plaintiff's own assertions. *See* Doc. 59 ¶ 16.

discrimination claim against QA and Ms. Bankhead under §1981,[9] wherein Plaintiff again claims that she was "forced" to sign in and out for lunch and restroom breaks, and was supposedly not paid for lunch breaks. *Id.* at ¶ 69

None of these claims of alleged discrimination involve "direct evidence," as Plaintiff admits that no comments were made to her by anyone at QA regarding her race, gender, sexual orientation, or appearance. (SUMF ¶¶ 9, 10).[10] Thus, to survive summary judgment on her discrimination claims, Plaintiff must point to sufficient evidence to suggest an inference of discrimination under either the *McDonnell-Douglas* burden-shifting model[11] or by "present[ing] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional

---

[9] The analysis is the same for a §1981 claim as a Title VII claim. *See Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1330 (11th Cir. 1998).

[10] Direct evidence is evidence that, "if believed, proves the existence of a fact without inference or presumption." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020) (citation omitted). "Only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Id*

[11] This paradigm first requires Plaintiff to point to evidence in the record that will allow her to establish a *prima facie* case of discrimination. If Plaintiff satisfies that requirement, Defendants can rebut any presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the alleged discriminatory actions. *Id.* At that point, the plaintiff's claim will not survive unless she can demonstrate that the evidence will permit a factual finding that the defendant's proffered reason was merely a pretext for unlawful discrimination. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009).

discrimination by the decisionmaker." *Robertson* at *16 (citation omitted). However, there is no evidence to support the allegations under either analysis.

A. **Plaintiff's Discrimination Claims Cannot Survive Under A *McDonnell Douglas* Analysis.**

Plaintiff cannot meet her initial burden under a *McDonnell-Douglas* analysis because the evidence will not support a *prima facie* case. For example, Plaintiff cannot point to any evidence that QA subjected her to an adverse employment action prior to the termination of her employment. In addition, she cannot prove a claim of race discrimination with respect to her termination[12] because the only person named as an alleged "discriminator" (i.e., Ms. Bankhead) had no input into that decision. Moreover, there is nothing to rebut the evidence that Plaintiff was fired by Dr. Sibley due to ongoing deficient work performance.

1. **The Only Adverse Employment Action Taken Against Plaintiff Was the Termination of Her Employment**

Essential to establishing a *prima facie* case of discrimination under *McDonnell Douglas* is that the plaintiff has evidence that she "was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004). Yet, for all but one of Plaintiff's allegations (i.e., everything except her

---

[12] Section II addresses the retaliation claims related to Plaintiff's termination.

termination) there is no evidence to establish that the alleged events even occurred, let alone show that she was subjected to an adverse employment action.[13]

For example, Plaintiff claims that QA discriminated against her based on sexual orientation and race because she supposedly was "forced" to sign in and out for lunch/breaks and was allegedly not paid for breaks, and she claims Caucasian and heterosexual employees were not treated similarly. Doc. 59 ¶¶ 37, 69.  But, the evidence does not support those assertions. None of QA's employees, including Plaintiff, were required to sign in or out for lunch or breaks. (SUMF ¶¶ 38-41) Instead, QA merely asked its employees, as a courtesy, to use the company's sign in/out logs to report their whereabouts when they were out of the office, in case they needed to be reached. *Id.*  The use (or non-use) of those logs had no effect on an employee's pay, and no employees were ever disciplined if they did not fill out the logs. *Id*.  In fact, there is no evidence that Plaintiff was ever disciplined for failing to sign in or out, and she admits that her paychecks always represented the full amount of her salary. (SUMF ¶ 37)  Thus, there is no basis for claims that

---

[13] An adverse employment action is "a serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.* "If an action has no effect on an employee, it is not an adverse employment action." *Clark v. Potter*, 232 F. App'x 895, 896 (11th Cir. 2007).

Plaintiff was treated differently or subjected to any adverse employment action regarding signing in/out or whether she was paid for breaks.

With that said, based on information learned in discovery, Defendants believe that Plaintiff will try to shift the "lunch break" argument from what she has pled (i.e., not paid for breaks) to claiming that she worked additional hours to "make up" the time she took for lunch.. However, Plaintiff was a salaried employee, and like all of her salaried coworkers, she was expected to work whatever hours were necessary to complete their assignments, regardless of whether it took under or over 40 hours a week. (SUMF ¶ 24-26). And, again, Plaintiff always received her full salary. (SUMF ¶¶ 30-31)  Therefore, there is still no evidence of an adverse employment action based on Plaintiff's schedule.

Moreover, even if the "worked extra hours" argument was appropriate, the evidence does not support Plaintiff's contentions.  For example, Plaintiff testified that she did not always stay later at work when she took a lunch. (SUMF ¶39).  In addition, QA's daily sign in/out logs (i.e., Pl. Dep. Exs. 16 through 23) show that there were 83 days that Plaintiff signed in and out for lunch (*See* Pl. Dep. Ex. 24).[14] On 43 of those days, her time in the office was <u>less than 7 hours</u>, and on another 34

---

[14] Pl. Dep. Ex. 24 is a summary of all of the daily sign in/out logs for days showing that Plaintiff took a lunch break.  The information for the summary was taken from Pl. Dep. Exs. 16-23.

of those days her "in office" time was less than 8 hours. *Id.*[15] Yet, Plaintiff testified that she interpreted the October 2015 "lunch break" conversation with Ms. Bankhead to mean that a salaried employee had to work 8 hours of "in office" time every day (i.e., if you get to work at 9 a.m. and then take an hour lunch, you have to work until at least 6 p.m. (SUMF ¶ 47).  Thus, the evidence shows that Plaintiff did not alter her work schedule based on that discussion with Ms. Bankhead.

Plaintiff also claims gender discrimination based on the purported "hypercriticism" of her work and an alleged lack of assistance.  But, again, she has not provided even one example to demonstrate her allegation.  In fact, the evidence shows quite the opposite. After Dr. Sibley realized that Plaintiff's performance was lacking, she personally began working with Plaintiff one-on-one to try to help her improve the quality of her work.  (SUMF ¶¶ 67-75, 78-80).  In addition, Tracey Bankhead talked Dr. Sibley out of firing Plaintiff in January 2016 and again that spring, and even offered to continue working with her after she learned of Dr. Sibley's intention to terminate Plaintiff's employment in May. (SUMF ¶¶141-142).

Additionally, Plaintiff fails to explain or point to any evidence to demonstrate how Ms. Bankhead was constantly "surveilling" her, but not the heterosexual coworkers on her team. *See* Doc. 59 ¶¶ 17, 37. Contrary to her

---

[15] According to the logs there were only 6 days that Plaintiff took a lunch and worked more than 8 hours, 3 of which she only stayed 10-15 minutes extra. *Id.*

allegations, the daily sign in/out logs show that the majority of QA's employees, including management, documented their time in and out of the office, so there is nothing to indicate any disparate treatment. *See* Pl. Dep. Exs 16-23. In addition, Ms. Bankhead testified that she only checked the sign in/out logs if she needed an employee and wanted to see if they were in the office, which included the logs for both Plaintiff and Ms. Ramey. (SUMF ¶ 42)  Thus, there is no evidence that QA was "surveilling" Plaintiff or using the sign in/out logs for any improper purpose.

Finally, Plaintiff alleges that her race was a "motivating factor" in "discipline" by QA (Doc 59 ¶ 54).  But, once again, she has not pointed to even one instance where she received any discipline during her employment with QA.

Thus, Plaintiff's discrimination claims based on being "forced" to sign in and out, non-payment for breaks, lack of assistance with work, "hypercriticism," "surveilling," and "discipline" cannot proceed because there is no evidence that any of these things happened to her. As such, the only allegations that the Court should consider for purposes of a discrimination claim are related to Plaintiff's termination of employment, which will be addressed below.

## 2.     Plaintiff Has Not Identified a Proper Comparator

Plaintiff also cannot establish a *prima facie* case of discrimination with respect to the termination of her employment because she cannot identify any other

QA employee who had similar performance deficiencies as her, but was not terminated.[16]  Likewise, even if the Court should find that any of Plaintiff's other discrimination allegations involve adverse employment actions, summary judgment remains unavoidable because there are no identified comparators, except for Plaintiff's assertion that Melissa Ramey was similarly-situated for purposes of the "lunch break" claims. *See* Doc 59 ¶¶ 23, 25. However, the evidence contradicts that contention.

It is undisputed that Plaintiff's understanding of the lunch break policy resulted from a discussion with Ms. Bankhead in October 2015. (SUMF ¶¶ 43-47) However, Ms. Ramey reported to a different supervisor (i.e., Michelle Adkins) from the beginning of her employment in late August 2015 until on or about February 17, 2016, and was informed about company policies by Ms. Mow when she first started working at QA. (SUMF ¶ 16-17, 127)   Thus, Ms. Ramey is not Plaintiff's comparator for that time period.[17]  In addition, there were no discussions

---

[16] For purposes of her *prima facie* case Plaintiff must demonstrate "that she and her comparators are 'similarly situated in all material respects..." *Lewis v. City of Union City,* 918 F.3d 1213, 1228-29 (11th Cir. 2019).

[17] *See Knox v. Roper Pump Co*., 957 F.3d 1237, 1248 (11th Cir. 2020), *quoting Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) (Discussing the effect of different supervisors on the comparator analysis and explaining that "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination.").

between Ms. Bankhead and Ms. Ramey about lunch breaks, even after Ms. Bankhead became Ms. Ramey's supervisor. (SUMF ¶¶ 126). Thus, there is no evidence that Ms. Bankhead had anything to do with the difference in how Plaintiff or Ms. Ramey understood QA's lunch break policy. So, even if the "lunch break" claim could be construed as involving an adverse employment action, the evidence does not support a *prima facie* case because Plaintiff has not identified a proper comparator. *See Lewis*, 918 F.3d at 1224. Likewise, Plaintiff has no evidence to suggest that Ms. Ramey was her comparator with respect to any claim related to work performance, as Ms. Ramey always met her deadlines, turned in complete work, and was available any time QA management needed her. (SUMF ¶¶ 18-19)

### 3.   There Is No Evidence of Pretext

If Plaintiff somehow is able to make out a *prima facie* case of discrimination on any of her allegations, her claims still cannot survive summary judgment because she cannot "produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc). For example, when Ms. Bankhead responded to Plaintiff's question about lunch breaks in October 2015, she simply made a mistake. (SUMF ¶¶ 44-46, 120) There is no evidence to contradict Ms. Bankhead's testimony that she provided

information to Plaintiff that she believed was correct based on her own time keeping practices during the 19+ years she had been employed by QA. *Id.* The fact that Ms. Bankhead apologized to Plaintiff after she realized her misunderstanding about lunch breaks further demonstrates her sincerity in acknowledging that she did not intend to provide incorrect information to Plaintiff. (SUMF ¶ 78). No credible evidence exists to contradict this testimony.

With respect to the termination of Plaintiff's employment, Dr. Sibley testified extensively regarding her decision to do so, citing the months of ongoing issues surrounding Plaintiff's work performance, her inability to improve, and the effects that it had on QA and its other employees. (SUMF ¶¶ 66-81, 84, 87, 101,145-146)  Ms. Demars and Ms. Bankhead testified similarly with respect to Plaintiff's deficient work. (SUMF ¶¶ 66, 74, 80-82, 85, 87, 89, 98, 99, 101-105, 141).  In addition, it is undisputed that Dr. Sibley made the termination decision on her own. (SUMF ¶¶ 147-150).  But, Plaintiff has only named Ms. Bankhead as the alleged discriminator, even though Ms. Bankhead saved Plaintiff's job at QA on more than one occasion, and also made an attempt to do so the weekend before the termination meeting. SUMF ¶¶ 141, 142, 151, 162).

Thus, there is no evidence to suggest that QA provided pretextual reasons for terminating Plaintiff.  While Plaintiff may not agree with QA's assessments of

her work or the decision to end her employment, she cannot succeed on her claims "by simply quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030. *See also Ward v. Troup Cnty. Sch. Dist.* (11th Cir. 2021), *quoting Alvarez v. Royal Atl. Devs., In*c., 610 F.3d 1253, 1266 (11th Cir. 2010) (Explaining that the Court's '"sole concern" in a Title VII civil action is whether the employer engaged in unlawful discrimination -- not whether the plaintiff is, in fact, a good employee.. In other words, "[a]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."'). Therefore, summary judgment on Plaintiff's discrimination claims must be granted because she has no evidence to create a genuine issue of material fact regarding QA's reasons for her termination.

## B. <u>There Is No "Convincing Mosaic" of Evidence of Any Discrimination</u>

With no way for her discrimination claims to survive under a *McDonnell Douglas* analysis, Plaintiff may attempt to argue that her claims can go forward under a "convincing mosaic" theory. But, to establish a "convincing mosaic" a plaintiff should have "evidence that demonstrates, among other things: (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systematically better treatment of similarly situated employees; and (3) that the employer's justification

is pretextual." *Robertson* at *17, *quoting Lewis v. City of Union City, Ga.,* 934 F.3d 1169, 1185 (11th Cir. 2019).  No such evidence exists in this case.

As Defendants have already pointed out, Plaintiff admits that there were no statements by anyone at QA that could be construed as negative regarding her race or gender/sexual orientation. (SUMF ¶¶7-8)  Likewise, there is nothing to suggest that QA treated any of its employees differently based on race, gender/sexual orientation, or any other protected characteristic.  Further, as discussed in Section I.A., *supra,* Plaintiff has no evidence to contradict Ms. Bankhead's testimony regarding her mistaken belief about lunch breaks, or Dr. Sibley's testimony that she made the decision to terminate Plaintiff's employment on her own, based on her personal observation of Plaintiff's performance issues. (SUMF ¶¶ 36-38; 105) Moreover, the fact that Ms. Bankhead advocated for keeping Plaintiff employed at QA on multiple occasions, including at the end of her employment, rebuts any assertion that she was treating Plaintiff in a discriminatory manner. (SUMF ¶¶ 142, 151)  Thus, there is no evidence to support a "convincing mosaic" theory.

## II.    Plaintiff Has No Evidence To Support Her Claims of Retaliation

In Counts II, and IV of her Second Amended Complaint Plaintiff alleges claims of Title VII retaliation against QA, and in Count VI she brings § 1981 claims of retaliation against QA and Ms. Bankhead, individually. *See* Doc. 59.

Again, because Plaintiff has not alleged any "direct evidence" of unlawful retaliation, the *McDonnell-Douglas* burden-shifting framework must be applied to determine whether these claims may go forward. *Ward v. Troup Cnty. Sch. Dist.* Appeal No. 20-11697, *11 (11th Cir. Apr. 1, 2021), *citing Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). However, Plaintiff's retaliation claims cannot survive under that analysis because there is no evidence to establish the "protected activity" and "causation" elements of her *prima facie* case.[18]

The underlying premise of Plaintiff's retaliation claims is that her employment was terminated shortly after she had conversations on May 20, 2016, wherein she expressed to Ms. Bankhead, Ms. Mow and Ms. Demars that she felt that she was being treated "differently" than her coworker Melissa Ramey with respect to lunch breaks. Doc 59 ¶¶ 43-45, 62, 74-75. But, those conversations in no way involved statutorily protected activity because Plaintiff never stated or even suggested that the alleged difference in treatment was due to her race and/or gender/sexual orientation. Plaintiff also incorrectly assumes that because Dr. Sibley terminated her employment a few days later after the May 20 conversations,

---

[18] To establish a *prima facie* case of Title VII and/or §1981 retaliation Plaintiff must show that (1) she engaged in statutorily protected activity, (2) that she suffered a materially adverse employment act and (3) that the materially adverse employment act was causally related to her protected activity. *Ward* at *11, *citing Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012).

the events must be causally related.  Doc. 59 at ¶¶ 29-30, 43-45, 61-62, and 74-75. Likewise, Plaintiff's claim against Ms. Bankhead is based on the assumption that she was involved in the termination decision, which is contradicted by the evidence.  Moreover, even if Plaintiff could establish a jury issue on her *prima facie* case, she has no evidence to rebut QA's legitimate, performance-based reasons for the termination of her employment.

**A. <u>Plaintiff Did Not Engage In Statutorily Protected Activity</u>**

The first element Plaintiff must demonstrate to establish unlawful retaliation is that she "engaged in statutorily protected expression." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). A complaint regarding an employment practice constitutes statutorily protected expression if the employee "explicitly or implicitly communicate[s] a belief that the practice constitutes unlawful employment discrimination." However, a generic internal complaint about unfair treatment is insufficient for a plaintiff to meet her burden on this element of a *prima facie* case of retaliation. *See Suber v. Lowes Home Ctrs*., Appeal No. 20-13142, *4 (11th Cir. Apr. 21, 2021) (unpublished), *citing Coutu v. Martin County Board of County Commissioners*, 47 F.3d 1068, 1074 (11th Cir. 1995) (Holding that an internal grievance about unfair treatment does 'not constitute statutorily protected activity' because '[u]nfair treatment, absent

discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII.').

In *Suber* the plaintiff was a Lowe's employee who was involved in an incident where a customer threatened him. *Id.* at *2. Subsequently, the plaintiff had discussions with and sent emails to Lowe's HR department containing generic allegations of unfair treatment and complaints about the inadequacy of Lowe's response to the incident. *Id.* The 11th Circuit upheld the dismissal of the plaintiff's retaliation claim for failure to establish the engagement in statutorily protected activity because nowhere in the plaintiff's correspondence was there an allegation that the treatment he received was based on a protected characteristic. *Id.* at *4.

Similarly, by her own admissions, Plaintiff never complained to anyone at QA that she felt that she was experiencing any adverse treatment because of her race or her gender, sexual orientation and/or any alleged gender non-conformity. (SUMF ¶¶ 2, 3 124, 128, 129, 137, 138). Instead, her statements to QA were merely that she allegedly felt that she was treated "unfairly" and "differently" than Ms. Ramey. *Id.*[19] Clearly, this evidence unequivocally demonstrates that Plaintiff cannot establish the essential element of "engaging in statutorily protected

---

[19] Plaintiff's EEOC Charge and Second Amended Complaint are also devoid of any facts to support any contention that she complained to QA about any type of alleged unlawful disparate treatment *See* Pl. Dep. Ex 3 and Doc. 59 ¶¶ 61, 74.

activity" for purposes of proving a *prima facie* case of retaliation. *See Suber, supra.  See also Ortiz v. Waste Mgmt*., Appeal No. No. 19-11922 (11th Cir. April 27, 2020) (Explaining that when a plaintiff fails to articulate facts regarding protected activity in her EEOC Charge and then summarily adds language to her pleadings that she made a complaint about unlawful discrimination, the claim will not survive unless there are facts in the record that can establish that the plaintiff specifically communicated to her employer that the treatment at issue was because of a protected characteristic).  Summary judgment, therefore, must be granted to QA on Counts II, IV and VI of Plaintiff's Amended Complaint, and to Ms. Bankhead on Count VI.

## B. Dr. Sibley Was Unaware of Any Statutorily Protected Activity

Even assuming, *arguendo,* that the evidence creates a jury issue as to whether Plaintiff can establish that she engaged in statutorily protected activity, her retaliation claims still fail because Dr. Sibley had no knowledge of any allegations of unlawful discrimination at the time she decided to terminate Plaintiff's employment. The Eleventh Circuit has recently reiterated that the inability to establish that the decisionmaker was aware of the plaintiff's protected activity is fatal to proving a claim of unlawful retaliation:

> As a starting point for any retaliation claim, a plaintiff needs to show (among other things) that the decisionmaker actually knew

about the employee's protected expression. See *Brungart [v. BellSouth Telecomms., Inc.]*, 231 F.3d [791] at 799 [(11th Cir. 2000)]. That awareness, like most issues of fact, can be established through circumstantial evidence—but not by unsupported inference. *See id*. In short, if Hogan did not know about Martin's discrimination complaints, he could not have fired her because of them. As we said in *Clover v. Total System Services, Inc.*, which governs this case, a jury finding that a decisionmaker was aware of an employee's protected conduct "must be supported by reasonable inferences from the evidence, not mere speculation." 176 F.3d 1346, 1355 (11th Cir. 1999).

*Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1053 (11th Cir. 2020).

In this case, the undisputed evidence shows that Dr. Sibley was the sole decisionmaker with respect to Plaintiff's termination. (SUMF ¶¶ 145, 147, 148. 154). So, assuming, *arguendo*, that Plaintiff engaged in statutorily protected activity on May 20, 2016, the legal question becomes whether or not Dr. Sibley had any knowledge about it. *Martin, supra.* According to the evidence, the answer to that question is a resounding "no."

Dr. Sibley was not in the office when the events occurred with Plaintiff on May 20, 2016, as she was out of town. (SUMF ¶ 143-145). She did not know about Plaintiff's May 20, 2016, email to Ms. Bankhead. (SUMF ¶ 149-150) Instead, her knowledge of the situation with Plaintiff was limited to what she learned through phone calls from Ms. Demars and Ms. Mow on May 20, 2016, as Plaintiff had never come to her with any issues of discrimination. (SUMF ¶ 144,

152). However, there was no mention to Dr. Sibley of anything that could even resemble a complaint of discrimination in that conversation. (SUMF ¶ 153).

Thus, there is simply no evidence to suggest that when Dr. Sibley made the decision to terminate Plaintiff's employment with QA she had any idea that Plaintiff was claiming any type of discrimination. Plaintiff also admits to having no knowledge of any conversations that Dr. Sibley had with anyone at QA in making the decision to terminate her employment, so she cannot rebut Dr. Sibley's testimony that she was unaware of any alleged protected activity. (SUMF ¶154). Thus, the lack of evidence to suggest that Dr. Sibley had any awareness of any statutorily protected activity by Plaintiff renders summary judgment for QA as appropriate on Claims II, IV and VI. *Vaughn v. Ret. Sys. (11th Cir. 2021), citing Martin,* 959 F.3d at 1053 (Dismissing a retaliation claim because a decisionmaker's awareness of protected activity cannot be established by "unsupported inference.").

Likewise, the §1981 claim of retaliation against Ms. Bankhead must be dismissed. Dr. Sibley testified that she alone made the decision to terminate Plaintiff's employment, without anyone's input. (SUMF ¶145-148). In fact, Ms. Bankhead offered to continue working with Plaintiff, even after Dr. Sibley informed her that the decision to terminate Plaintiff had been made. (SUMF ¶ 151). Thus, Plaintiff has no factual basis to hold Ms. Bankhead individually responsible

for the termination of her employment. *See Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) (citations omitted) ("[P]ersonal liability cannot be imposed on a corporate official for the corporation's violation of section 1981 when that official is not alleged to have participated in actual discrimination against the plaintiff").[20]

### C. **QA Had Legitimate Reasons For Terminating Plaintiff's Employment**

Because Plaintiff cannot point to evidence to support a *prima facie* case of retaliation, the Court's inquiry on summary judgment ends and Defendants' motion must be granted on these claims. *Jimenez v. Wellstar Health Sys*., 596 F.3d 1304, 1311 (11th Cir. 2010). With that said, in the event that it is somehow determined that the retaliation claims could move forward to the pretext analysis, Defendants point out that they have met their legal burden of producing a legitimate reason for Plaintiff's termination (i.e., ongoing poor work performance and failure to improve), and Plaintiff cannot point to any evidence in the record to rebut that reason. *See* Section I.A.3, *supra*.[21] As such, there is no issue for a jury to resolve, and summary judgement is warranted on Plaintiff's retaliation claims.

---

[20] *See also Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015), *quoting Back v. Hastings On Hudson Union Free Sch. Dist*., 365 F.3d 107, 127 (2d Cir. 2004) (Finding that individual liability for retaliation under § 1981 is only established "if that individual is 'personally involved in the alleged deprivation.'")

[21] Defendants hereby incorporate the arguments and evidence in Section I.A.3., *infra,* as it set forth fully herein.

## CONCLUSION

Because Plaintiff's allegations are not supported by any evidence in the record that would raise a genuine issue of material fact on her alleged claims of discrimination and retaliation, there is nothing for a jury to consider in this case. Summary judgment, therefore, must be granted on all Counts of Plaintiff's Second Amended Complaint.

## CERTIFICATION

In accordance with LR 7.1D, NDGa, the undersigned hereby certifies that this Memorandum of Law complies with the font and point selections approved by the court in LR 5.1B, NDGa.

Respectfully submitted this 14th day of June 2021,

**/s/ Robert C.D. McDonald**
Georgia Bar No. 489600
Attorney for Defendants

The Law Offices of Robert C.D. McDonald, P.C.
5410 Matt Highway, PMB 3
Cumming, Georgia 30028
Phone: (770) 662-1550
Facsimile: (770) 662-1561
rmcdonaldlaw@ceocenters.com