IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| APRIL KIMBLE, | : | CIVIL ACTION NO. |
| | : | 1:19-CV-2549-JPB-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| QUALITY ASSIST, INC. and | : | **ORDER AND FINAL REPORT** |
| TRACEY BANKHEAD, | : | **AND RECOMMENDATION ON A** |
| | : | **MOTION FOR SUMMARY** |
| Defendants. | : | **JUDGMENT** |

Plaintiff April Kimble initially filed this employment discrimination action on June 3, 2019. Plaintiff claims that her former employer, Quality Assist, Inc. ("QA"), and her supervisor, Tracey Bankhead, discriminated against her because of her race. In her Second Amended Complaint [59] ("Compl."), Plaintiff alleges that QA engaged in race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.* and the Civil Rights Act of 1866 ("§ 1981"), 42 U.S.C. § 1981, and that Bankhead engaged in § 1981 race discrimination and retaliation.[1]

---

[1] She also alleges that QA engaged in Title VII sex, sexual orientation, and gender nonconformity discrimination and retaliation, but does not contest that QA is entitled to summary judgment on those claims.

The action is before the Court upon Defendants' Motion for Summary Judgment [85] ("MSJ"), Plaintiff's "Motion for Leave of Court to Exceed Page Limitations for Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment" [99] ("Page Limit Motion"), Plaintiff's "Motion for Leave to File Exhibits to Plaintiff's Response to Defendants' Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment Past the Filing Deadline Due to Technical Error" [109] ("Late Exhibits Motion"), and Plaintiff's "Motion for Leave to File a Clerical Correction Due to Technical Error to Plaintiff's Response to Defendants' Statement of Material Facts in Opposition to Defendants' Motion For Summary Judgment" [111] ("Clerical Correction Motion"), which as explained below are all **GRANTED**. Additionally, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [85] be **GRANTED** as to Counts I, II, IV, and VI but **DENIED** as to Counts III and V.

## I.   FACTS

Unless otherwise indicated, the Court draws the facts stated herein from Defendants' "Statement of Material Facts as to Which There is No Genuine Issue to be Tried" [85-2] ("DSMF"), Plaintiff's response thereto [98] ("PRDSMF"), Plaintiff's "Statement of Material Facts" [97-1] ("PSMF"), and Defendants'

response thereto [114-1] ("DRPSMF").[2]  Where appropriate, the Court directly cites to underlying exhibits filed by the parties.

The Court must accept those facts submitted by Defendants that are supported by citations to record evidence, and which Plaintiff has not expressly disputed with citations to record evidence. *See* LR 56.1(B)(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1).").

Accordingly, for those facts submitted by Defendants that Plaintiff has failed to dispute with citations to record evidence, the Court must accept the facts as true, so long as the facts are supported by citations to record evidence, do not make credibility determinations, and do not involve legal conclusions. *See E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC*, No. CIV. A. 1:05-CV-2504-TWT, 2007

---

[2]  Defendants filed "Objections to Plaintiff's Response to Defendants' Statement of Material Facts for Which There Is No Issue to Be Tried" [114-3], which is effectively a reply to Plaintiff's response [98]. Plaintiff then filed a reply to Defendants' Objections [117]. Local Rule 56.1(B) does not contemplate the filing of replies like these, and accordingly the Court has not considered them.

WL 602212, at *3 (N.D. Ga. Feb. 16, 2007). The Court has nevertheless viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

The Court has excluded assertions of fact by either party that are clearly immaterial, or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to admissible evidence in the record or asserted only in a party's brief and not in its statement of facts. *See* LR 56.1(B)(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."); *see also* LR 56.1(B)(2)(b) (respondent's statement of facts must also comply with LR 56.1(B)(1)). Nevertheless, the Court includes certain facts that are not necessarily material, but which are helpful to present the context of the parties' arguments. The Court will not rule on each objection or dispute presented by the parties and will discuss those objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact.

QA was founded in 1987 for the purpose of increasing the number of learning resources available to young children.[3] DSMF ¶ 1. Plaintiff April Kimble is a homosexual African American female.[4] DSMF ¶ 5; Compl [59] ¶ 5. She was hired by QA on September 24, 2015 as a Content Developer II/Subject Matter Expert. PSMF ¶ 22. Plaintiff's job duties consisted of subject matter research, writing for an E-learning platform, and writing online learning modules. PSMF ¶ 31. In her role, Plaintiff was assigned to write 25-30-page manuscripts. PSMF ¶ 34. Throughout Plaintiff's employment with QA, her immediate supervisor was Defendant Tracey Bankhead, who had been at QA since 1998.[5] DSMF ¶ 10. Bankhead is Caucasian. *See* PSMF ¶ 28; DRPSMF ¶ 28.

---

[3] Plaintiff needlessly quibbles with this statement, speculating that because "QA is a for-profit business, QA was likely established for the purpose of enriching the income of its stockholders." PRDSMF ¶ 1. This gratuitous objection, and the many like it raised by both sides, are not material to the issues relevant to this motion and have made this case unnecessarily burdensome. As the large number of footnotes in the pages that follow show, the Court has attempted to wade through and discuss as many of the parties' disputes—many of which are unsupported and/or clearly immaterial—as possible. The Court has not been able to address every such dispute in this case but has attempted to do so with regard to potentially material ones.

[4] Plaintiff admits this "in part," but notes that she "identifies as a Black cisgendered woman." PRDSMF ¶ 5. However, the language used by Defendants comes straight from Plaintiff's Second Amended Complaint. *See* Compl [59] ¶ 5 ("Plaintiff . . . is a homosexual, African American female").

[5] Plaintiff denies this fact, noting, "Both Bankhead and Atkins [*sic*] were supervisors at the time of Plaintiff's hire. During the time that Michelle Adkins was employed, she was superior to and sometimes signed Plaintiff's time sheets. Plaintiff also had

Melissa Ramey, who is Caucasian, was hired in August 2015 as a Content Developer II/Subject Matter Expert, like Plaintiff. PSMF ¶¶ 28, 32; DRPSMF ¶ 28. Ramey and Plaintiff were on the "Content Team" along with Bankhead. DRPSMF ¶ 28. Initially, Michelle Adkins (who is Caucasian) was on the Content Team as well, but she left QA in February 2016. DRPSMF ¶ 28. In March 2016, Gillian Lee-Fong (who is African American) joined the Content Team. DSMF ¶¶ 20[6]-21. Ramey was not assigned to write Manuscripts like Plaintiff, but instead wrote "nuggets" of information or brief courses on "Parentivity." PSMF ¶ 33. Ramey's direct supervisor was Michelle Adkins from the inception of her employment until Adkins left QA in February 2016.[7] DSMF ¶ 16; PSMF ¶ 45. After Adkins left, Bankhead became

_____

Adkins review her work for input." PRDSMF ¶ 10 (citations omitted). None of this contradicts the fact that Bankhead was Plaintiff's *immediate* supervisor, and so the Court takes this fact as established for purposes of this motion.

[6] Plaintiff does not cite to any evidence to support her partial denial of the statement "Gillian Lee-Fong, an African American female, began working for QA on March 7, 2016, and reported to Tracey Bankhead." PRDSMF ¶ 20.

[7] Plaintiff denies Defendants' statement that "Melissa Ramey reported to Michelle Adkins . . . from the inception of her employment until Ms. Adkins left QA in February 2016[,]" DSMF ¶ 16, but the statement is supported by evidence that Plaintiff herself cites. *See* PRDSMF ¶ 16; Ramey Dep. [115] at 134:13-18 ("When I was hired, Tracey [Bankhead] and Michelle [Adkins] were considered to be at the same level, but Michelle was primarily working – was primarily my supervisor, but in some broader sense, they were both my supervisors. It's just Michelle was more directly over me."). Plaintiff's denial is particularly perplexing in light of her own assertion that "Michelle Adkins supervised Ramey until February 2016[.]" PSMF ¶

Ramey's supervisor. PSMF ¶ 45. Plaintiff and Ramey were both salaried employees, meaning the number of hours they worked did not impact how much they were paid. *See* DSMF ¶ 30;[8] PSMF ¶¶ 42-43, 57; DRPSMF ¶ 141. According to Defendants, Ramey turned in complete work, met her deadlines, was never difficult to find[9] in QA's offices and attended meetings on time. DSMF ¶¶ 18-19

At the core of this case is a dispute about whether and to what extent the hours required of employees were impacted by lunch breaks. In October 2015, Plaintiff and Bankhead had a conversation[10] about whether or not employees needed to stay later at work if they took a lunch break. DSMF ¶ 43. Bankhead explained to Plaintiff that she should only record the hours that she actually worked on her time sheet,

---

45. In any event, this assertion, like so many the parties fight about, is not ultimately material here.

[8] Plaintiff's objection that she "is without sufficient knowledge to respond" to Defendants' statement that "Salaried employees at QA receive the same pay regardless of the number of hours they work in a day or week[,]" DSMF ¶ 30; PRDSMF ¶ 30, is not a valid objection, *see* Rule 56.1(B)(2)(a)(4), but also is contradicted by her own statement that "Plaintiff got paid for a 40 hour workweek 'no matter what,' i.e., how many hours she worked on any given day." PSMF ¶ 57.

[9] Plaintiff contends that Ramey was not hard to find because Bankhead was not looking for her. PRDSMF ¶ 19.

[10] Defendants state that this conversation was initiated by Plaintiff, DRPSMF ¶ 132, but this statement is unsupported because they only cite to a portion of their own statement of material facts (DSMF ¶ 116), which does not support it. *See* DSMF ¶ 116 ("On or about *May 10, 2016*, Plaintiff approached *Ms. Mow* and claimed that she was working extra hours to make up time that she took for lunch breaks." (emphasis added)).

which did not include time taken for lunch. DSMF ¶ 46. In other words, if Plaintiff got to work at 9 a.m. and then took an hour-long lunch, she would have to work until 6 p.m., thereby putting in eight hours of "in office" time. *See* DSMF ¶¶ 47, 120. Plaintiff asserts that Bankhead told her that if she did not work an extra hour after taking an hour-long lunch break, she was "stealing" from the company. PSMF ¶ 129. Bankhead applied this policy to herself, that is, in documenting the time that she herself had worked, she excluded any hours she took for lunch. DSMF ¶ 44. However, it is undisputed that Bankhead's explanation of QA's policy regarding lunch breaks was incorrect, and that employees were not required to work extra hours to make up for lunch breaks. *See* DSMF ¶ 120.

Plaintiff claims that "[b]y complying with Bankhead's policy, Plaintiff used her vacation time, which resulted in her not only having less vacation time, but also resulted in less pay from QA for unused time at the time of her termination." PSMF ¶ 147. She also contends that "QA's policy was to award extra time off to employees who worked extra hours[,]" and because the time on her timesheets was deflated, she "was not able to be awarded additional time[.]" PSMF ¶¶ 150-151. Defendants deny this, arguing that there was no policy at QA that allowed employees to "bank" hours to use later. DSMF ¶ 31.

While there may have been no formal policy, testimony cited by both parties shows that employees who worked longer hours could be rewarded with leave. *See*

Mow Dep. [89] at 44:4-16 ("**Q**: Does QA also have something that's similar to banking hours or something to that effect? **A:** No. **Q:** So . . . QA does not have something where you can accumulate hours and use them so you don't have to use vacation time? **A:** No. But I will tell you that if we have an employee who is working a tremendous number of hours, we will note that and we will often give them time off to accommodate the fact that they've just spent 48 or 60 hours working during a workweek. So there's nothing written that we do any kind of banking of hours."). Additionally, Defendants contend that there is no evidence that Plaintiff was forced to use vacation time, *see* DRPSMF ¶ 147, but Plaintiff did provide a sworn declaration to that effect. *See* Pl. Decl. [97-2] ¶ 2. Defendants also point out that Plaintiff did not take any time off without pay, and was paid for any unused vacation time, *see* DRPSMF ¶ 147, but this misses Plaintiff's point—she is contending that she *used more* vacation time than she needed to while employed by QA, which meant that she was paid out for *less* vacation time when she was fired. *See* PSMF ¶ 147.

Defendants also contend that their analysis of QA's sign-in/sign-out sheets indicates that Plaintiff "never worked [the] 48 or more hours" in a given week that could have entitled her to time off. *See* DRPSMF ¶ 151. But while Mow referred to working 48 or more hours in a given week as an example of what might be rewarded with extra compensatory time, it is not clear that this was an exclusive example. That QA lacked a formal policy as to the circumstances that would warrant an award of

compensatory time implies that there was no such strict cut-off. Thus, the Court cannot conclude that there is no disputed issue of fact as to whether Plaintiff may have been a candidate to receive extra compensatory time had she not been incorrectly instructed by Bankhead to deduct her lunch hour from her timesheets.

Bankhead never told Ramey that she had to stay late at work if she took a lunch break,[11] and Ramey did not work extra to make up for taking lunch,[12] or

---

[11] Defendants object to this fact on a number of grounds, some of which do not merit discussion. Notably though, their contention that "Plaintiff was the individual who initiated [Plaintiff and Bankhead's] October 2015 conversation" is unsupported by the citation provided. *See* DRPSMF ¶ 132; DSMF ¶ 116. In any event, whether Plaintiff initiated the conversation or not would not alter the disposition of this motion. Their statement that there "was no reason for Ms. Bankhead to have a conversation about lunch breaks with Ms. Ramey," like most of the response, is merely argumentative and does not genuinely dispute the asserted fact. To the contrary, Defendants' response ultimately admits the asserted fact, that is, that "no such discussions occurred." *See* DRPSMF ¶ 132. This response is an example of the improper, abusive responses that both parties have engaged in throughout this motion practice. Defendants' responsibility in response to this asserted fact, for example, was to simply admit it, dispute it, or object on one of the specific grounds allowed by the Local Rules, not to argue their legal position as to why the Court should enter summary judgment regardless of the fact. That is the role of the brief.

[12] Defendants' response again constitutes an improper legal brief that does not state a valid admissibility objection but rather argues, on the merits, that the fact does not support an allegation of discrimination. Again, that is not the role of a Rule 56.1 response. It is obvious that Defendants do not actually dispute Plaintiff's statement, and they in fact admit in their objections that "Ramey had a different understanding of the policy" than Plaintiff did. DRPSMF ¶ 133.

understand that she needed to. PSMF ¶ 132-133; DRPSMF ¶ 133. Ramey agrees that Plaintiff "[f]or sure"[13] worked more hours than she did. PSMF ¶ 141.

On or about May 17,[14] 2016, Plaintiff spoke to Susan Mow, who handles HR matters for QA, and learned that she did not have to stay later if she took a lunch break. DSMF ¶¶ 116-118; PSMF ¶ 152[15]. Mow spoke with Bankhead and corrected Bankhead's misunderstanding about QA's lunch break practice. DSMF ¶ 119.[16] Defendants claim that Bankhead apologized to Plaintiff for telling her the wrong information about the policy, DSMF ¶ 120, but Plaintiff denies this, PSMF ¶ 153.

On Friday May 20, 2016, Plaintiff emailed Bankhead questioning why Bankhead told Plaintiff she had to work later if she took a lunch break and did not tell Ramey the same; Bankhead responded, "Come see me now." PSMF ¶ 155. At

---

[13] Defendants quibble with this characterization, and suggest that it is taken out of context. DRPSMF ¶ 141. For reference, the exchange at the deposition was: "**Q:** Do you think that Ms. Kimble -- did you think that Ms. Kimble's work hours seemed different from yours? **A:** It wasn't -- I never thought about what other people were doing. Like, it's not something that I thought about. **Q:** But when we reviewed the timesheets, you realized that she was working longer hours? **A:** Yeah. **Q:** Okay. **A:** For sure." Ramey Dep. [115] at 159:24-160:9.

[14] Defendants contend that the discussion took place on or about May 10, 2016, *see* DSMF ¶ 118, but the exact date is immaterial.

[15] Defendants' objections do not contradict this. *See* DRPSMF ¶ 152.

[16] Plaintiff denies this paragraph, but her denial is merely an assertion that she lacks personal knowledge of the conversation and a dispute about the exact date. PRDSMF at ¶ 119. She does not deny that the conversation took place. *See id.*

the meeting, Plaintiff spoke in a very loud voice and yelled at Bankhead.[17]  DSMF ¶ 123. She expressed to Bankhead that other people thought Bankhead was treating her "differently" than Ramey. DSMF ¶ 124; PSMF ¶ 156[18]. During the exchange, Bankhead made a comment about professionalism, but the parties disagree about exactly what was said. *See* DSMF ¶ 125 ("Bankhead told Plaintiff that a salaried professional stays until the work gets done and it doesn't matter about the number of hours."); PSMF ¶ 158 ("Bankhead called Plaintiff 'unprofessional.'").

After speaking with Bankhead, Plaintiff went to Mow's office to complain about Bankhead treating her and Ramey differently. PSMF ¶ 159. After hearing Plaintiff, who sounded upset and was using a louder than usual voice, through the door of Mow's office, and speaking with Bankhead, Vice President Kim-Tai DeMars joined the meeting. PRDSMF. ¶ 133. Demars sent Plaintiff home for the rest of the day, so Plaintiff could calm down and collect herself. DSMF ¶ 140.

Plaintiff claims that "[b]y using the word 'differently,' [she] meant because of race since she was the only African American supervised by Bankhead who was

---

[17]  Plaintiff's denial lacks citations, *see* PRDSMF ¶ 123, and is thus disregarded.

[18]  Defendants puzzlingly object on materiality and hearsay grounds to Plaintiff's statement that reads in part, "Plaintiff told her that other people noticed Bankhead had been treating Plaintiff differently from Ramey." *See* DRPSMF ¶ 156. Their own statement of material facts includes a nearly identical statement: "Plaintiff expressed to Ms. Bankhead that other people thought Ms. Bankhead was treating her 'differently' than Ms. Ramey with respect to lunch breaks." DSMF ¶ 124.

treated differently than her white coworker Ramey." PSMF ¶ 157. Defendants contend that "Plaintiff never expressed to Ms. Bankhead, Ms. Mow, or Ms. Demars that she felt that she was being treated differently at QA *because of her race*." DSMF ¶ 137 (emphasis added). Plaintiff denies Defendants' statement, but none of the evidence she cites contradicts it. *See* PRDSMF ¶ 137. In fact, some of testimony that she cites is part of an exchange that *supports* Defendants' point. *See* Kimble Dep. [96] at 98:15-99:9 ("**Q:** The question was during the meeting with Ms. Bankhead, you told her other people noticed that she was treating you and Melissa [Ramey] differently. Is that correct? **A:** Yes. **Q:** Is that right? Okay. You didn't say anything about race . . . Is that correct? **A:** When I said differently, it was because of that difference because . . . Melissa Ramey and Tracey Bankhead are both Caucasian, heterosexual women. And I am an African-American, homosexual woman. And that is different than those two are. **Q:** But you didn't say that to Ms. Bankhead. You just said differently. Is that correct? **A:** It was differently, and I was insinuating that.").

After the meeting between Plaintiff, DeMars, and Mow, Demars, Mow and Bankhead met and called QA's CEO, Dr. Annette Sibley, to let her know what had happened.[19] PSMF ¶ 170. Over the weekend following the events of May 20, 2016,

---

[19] Defendants point out that specifically, DeMars' testimony was: "After that . . . we did meet with Susan [Mow] and Tracey [Bankhead] . . . And we called Annette

Sibley, decided to terminate Plaintiff, and Plaintiff was terminated the following Monday, May 23, 2016. DSMF ¶ 145; PSMF ¶ 177. During Plaintiff's termination meeting, Sibley told Plaintiff that her financial and professional development needs were too great, and that there was not a mutual fit between Plaintiff and QA. PSMF ¶¶ 178-179. Sibley testified that "[t]he Friday [May 20] events were kind of the, okay, I'm done now. That's enough. I've given it all the patience I have and I'm done." Sibley Dep. [87] 193:21-23; *see also* PSMF ¶ 171. But Sibley clarified that Plaintiff "wasn't terminated because of the Friday. She was terminated because of poor performance over many, many months." Sibley Dep. [87] 193:23-25; *see also* DRPSMF ¶ 171.

The parties hotly dispute the reasons for Plaintiff's termination. According to Defendants, "Sibley's decision to terminate Plaintiff's employment with QA was based on her firsthand observations of Plaintiff's months of missed deadlines, missed revised deadlines, and recurring poor work performance that caused contract delays with clients and disrupted other staff members' assignments." DSMF ¶ 146. They also assert that Sibley was "concerned by Plaintiff's failure to understand what it meant to be a salaried employee, as opposed to hourly"—in other words Plaintiff

---

[Sibley] just to let her know that April had been upset and that I had encouraged her to take the afternoon off." Demars Depo. [90] at 84:3-8.

should not have cared about the lunch break issue because, as a salaried employee, she was expected to put in whatever time was needed to get the work done, whether it was more or less than forty hours a week. *See* DSMF ¶¶ 29, 146. Defendants contend that "Sibley did not consider input from anyone else when she decided to terminated [*sic*] Plaintiff's employment with QA[,]" "Bankhead had no role in the decision to terminate Plaintiff's employment[,]" and "Sibley was never informed that Plaintiff had made any allegations that she was being treated differently than Ms. Ramey or anyone else at QA." DSMF ¶¶ 147-148, 153. According to Defendants, after Sibley decided to terminate Plaintiff, Bankhead told Sibley that she was still willing to work with Plaintiff. DSMF ¶ 151. Defendants assert that prior to Plaintiff's termination, in early 2016, Sibley and Demars felt that Plaintiff's employment should be terminated because of Plaintiff's continued inability to meet deadlines and failure to improve her writing skills, but she was not terminated because on several occasions Bankhead asked to continue working with her to see if she could improve. DSMF ¶¶ 141-142.

Plaintiff denies that her performance was poor—she notes that during her six-month review in March 2016, Bankhead told Plaintiff she was a "great" employee. PSMF ¶ 73. She also argues that Bankhead was "hypercritical" of Plaintiff's performance. PSMF ¶ 65. Regarding deadlines, she contends that Bankhead "often changed deadlines on a whim, without notice and didn't tell Plaintiff[,]" but

"allowed Sibley to believe that Plaintiff always knew about deadlines in advance[.]" PSMF ¶¶ 110-111. According to Plaintiff, Sibley was not planning to terminate Plaintiff before May 20, but Plaintiff's "complaint about unfair treatment on May 20" was what "pushed Sibley to terminate Plaintiff[.]" PSMF ¶¶ 171, 173.

Plaintiff also contends that Bankhead engaged in constant surveillance of Plaintiff's whereabouts by always asking where she was via text, even when Plaintiff was using the restroom, whereas Ramey came and went freely in the office without Bankhead constantly looking for her. PSMF ¶¶ 135-136. In response to Bankhead asking Plaintiff's colleagues about her whereabouts, Plaintiff put a sign on her desk letting Bankhead know when she had gone to use the restroom. PSMF ¶ 137. Defendants counter by arguing that Bankhead was constantly looking for Plaintiff because she was frequently away from her desk, whereas Ramey was never difficult to find in QA's offices and attended meetings on time. DSMF ¶ 19; DRPSMF ¶ 135.

Plaintiff has not alleged that anyone at QA has ever made any comments (verbal or written) to her regarding her race. DSMF ¶ 9.

Defendants filed the instant Motion for Summary Judgment [85] on June 14, 2021. Plaintiff responded [97] on August 6, 2021 ("Pl. Br."), and Defendants filed a reply [114] on September 17, 2021 ("D. Reply").

## II.    DISCUSSION

### A.    *Page Limit, Late Exhibits, and Clerical Correction Motions*

As a preliminary matter, the Court addresses Plaintiff's Page Limit Motion [99], Late Exhibits Motion [109], and Clerical Correction Motion [111].

In the Page Limit Motion [99], Plaintiff seeks leave for her brief in opposition to the Motion for Summary Judgment to be thirty-four pages long. She filed this motion on the same day as her Brief [97], which contains thirty-four substantive pages. In her Late Exhibits Motion [109], Plaintiff contends that she was unable to file certain exhibits to her Response to Defendants' Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment before the relevant deadline, "due to technical error[,]" and seeks leave of the Court to file them nonetheless. She filed this motion after filing the referenced exhibits on the docket. *See* Dkt. Nos. 100-108. Finally, in her Clerical Correction Motion [111], Plaintiff states that she "realized that the signature page and certification were left off" her Response to Defendants' Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment [98], and seeks leave to correct this clerical error.

Defendants have not responded to any of these three motions. Under the Local Rules, "[f]ailure to file a response shall indicate that there is no opposition to [a] motion." LR 7.1(B), NDGa. Accordingly, Plaintiff's Page Limit Motion [99], Late Exhibits Motion [109], and Clerical Correction Motion [111] are **GRANTED** as

unopposed. The undersigned has considered all thirty-four pages of Plaintiff's "Response in Opposition to Defendants' Motion for Summary Judgment" [97] and Plaintiff's belatedly filed exhibits [100]-[108]. Additionally, the undersigned has considered "Plaintiff's Response to Defendants' Statement of Material Facts" [98] as if it had been filed with the proper signature page and certification.

B.   *Motion for Summary Judgment*

1.   Summary Judgment Standard

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." *Dietz v. Smithkline Beecham Corp.*, 598 F.3d 812, 815 (11th Cir. 2010) (citing Fed. R. Civ. P. 56(c)). The movant bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. *See Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014).

Once the movant has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* at 248. An issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249-50. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See id.* at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

2.      Plaintiff's Claims

In Counts I and II respectively, Plaintiff asserts that QA engaged in sex, sexual orientation, and gender nonconformity discrimination and retaliation in violation of Title VII. Compl. [59] at ¶¶ 36-51. In Counts III and IV respectively, she asserts that that QA engaged in Title VII race discrimination and retaliation. *Id.* at ¶¶ 52-66. In Counts V and VI respectively, she alleges that QA and Bankhead engaged in race discrimination and retaliation in violation of 42 U.S.C. § 1981. *Id.* at ¶¶ 67-78.

a.      Sex, Sexual Orientation, and Gender Nonconformity

As a preliminary matter, "Plaintiff does not contest summary judgment on Plaintiff's Title VII gender claims, including gender nonconformity and sexual

orientation and retaliation based on sex." Pl. Br. [97] at 12 n.2. Thus, the undersigned

**RECOMMENDS** that summary judgment be **GRANTED** as to Counts I and II.

        b.      Standards of Proof Under Title VII and § 1981

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits employers from retaliating against employees because of their opposition to practices made unlawful under the statute or their participation in related proceedings. *Id.* at § 2000e-3(a).

Similarly, § 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981. It is well-settled law that the statute prohibits race discrimination in both the public and private employment context. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997); *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991) ("The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace."); *see also St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination

in the making of private as well as public contracts."). Further, § 1981 encompasses claims of race-based retaliation as well as claims of race discrimination. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008); *see also Bryant v. Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009).

For employment claims, the elements required to establish a claim under § 1981 generally mirror those required for a Title VII claim. *See Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256-57 (11th Cir. 2012) ("Title VII and § 1981 'have the same requirements of proof and use the same analytical framework.'" (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)); *see also Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994); *Brown*, v. *Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991).

Discrimination claims "are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). An employee can succeed on a mixed-motive claim under Title VII by showing that illegal bias was a motivating factor for an adverse employment action, even though other factors also motivated the action. *See id.* By contrast, single-motive claims, *i.e.*, pretext claims, require a plaintiff to show that bias was *the* true reason for the adverse action. *Id.* Claims of discrimination under § 1981 and claims of retaliation under Title VII may not proceed under a mixed motive theory; rather, plaintiffs asserting such claims must show that discrimination or retaliation was the

but-for cause of the adverse employment action they suffered. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (§ 1981); *University of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (Title VII retaliation). Both single-motive and mixed-motive claims can be established with either direct or circumstantial evidence. *Quigg*, 814 F.3d at 1235; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To prevail on a claim for discrimination or retaliation, a plaintiff must prove that the defendant acted with discriminatory or retaliatory intent. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Discriminatory intent may be established either by direct evidence or by circumstantial evidence. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (*en banc*). Similarly, proof of unlawful retaliation may be in the form of direct evidence or circumstantial evidence generally governed by the *McDonnell Douglas* burden-shifting framework. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993).

Direct evidence is evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Evidence, Black's Law Dictionary* 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d

578, 581-82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks whose intent could only be to discriminate constitute direct evidence. *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020); *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 582. Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence. *See Harris v. Shelby Cty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996). "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990) *abrogated on other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 513 (1993); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998).

Evidence that merely "suggests discrimination, leaving the trier of fact to *infer* discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990). Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, which can be done using the *McDonnell Douglas* burden-shifting framework referenced above. *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d at 1226; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28

(11th Cir. 1997). Under the *McDonnell Douglas* standard, a plaintiff may establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action by her employer; (3) she was qualified to do the job in question, and (4) her employer treated similarly situated employees outside her protected classification (*i.e.*, those of a different race) more favorably than it treated her. *See McDonnell Douglas*, 411 U.S. at 802; *Lewis*, 918 F.3d at 1220-21. To establish a *prima facie* case of illegal retaliation, a plaintiff must show that: (1) she engaged in a protected activity or expression, (2) she received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g.*, *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1244 (11th Cir. 2020); *Gate Gourmet*, 683 F.3d at 1258; *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998).

Once a *prima facie* case has been established under the *McDonnell Douglas* framework, the employer must come forward with a legitimate non-discriminatory reason for its action. *Lewis*, 918 F.3d at 1221; *Goldsmith*, 996 F.2d at 1162-63; *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600-01 (11th Cir. 1986). If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Lewis*, 918 F.3d at 1221; *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-01.

However, the *McDonnell Douglas* proof structure was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984), *abrogated on other grounds by Lewis*, 918 F.3d at 1226. Indeed, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

A plaintiff may also defeat a motion for summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). As such, the Eleventh Circuit has held that a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith*, 644 F.3d at 1328). "Even without similarly situated comparators," a plaintiff will survive summary judgment

26

if they present a convincing mosaic of circumstantial evidence from which a factfinder can infer discriminatory motivation. *Lewis*, 934 F.3d at 1185. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

    c. Discrimination

      (1) Direct Evidence

 Defendants correctly point out that Plaintiff has not put forward any direct evidence of discrimination. *See* MSJ [85] at 13. "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Fernandez*, 961 F.3d at 1156. Here, Plaintiff has not alleged that anyone at QA ever made any comments to her regarding her race. DSMF ¶ 9. Accordingly, as discussed above, Plaintiff must either use the *McDonnell Douglas* burden-shifting framework or present a convincing mosaic of circumstantial evidence from which a factfinder can infer discriminatory motivation to survive the Motion. *See McDonnell Douglas*, 411 U.S. at 802; *Lewis*, 934 F.3d at 1185.

      (2) Plaintiff's *Prima Facie* Case Under *McDonnell Douglas*

 To establish a *prima facie* case of discrimination under *McDonnell Douglas*, Plaintiff must show that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action by her employer; (3) she was qualified

to do the job in question, and (4) her employer treated similarly situated employees outside her protected classification (*i.e.*, those of a different race) more favorably than it treated her. *See McDonnell Douglas*, 411 U.S. at 802; *Lewis*, 918 F.3d at 1220-21. There is no dispute that Plaintiff's being African American makes her a member of a protected class. Similarly, Defendants' arguments about the quality of Plaintiffs' work appear to go to whether there was a legitimate reason for her termination—not whether she was qualified to do the job. Thus, the dispute centers on whether there was an adverse employment action, and whether Ramey can be considered a comparator.

(i)     Adverse Employment Action

Based on the Complaint and the briefing, it appears that there are two potential adverse employment actions in this case: (1) Plaintiff's termination and (2) the differential requirement applied to Plaintiff in terms of her required hours of work. There is no dispute that termination constitutes an adverse employment action. *See* MSJ [85] at 14 ("The Only Adverse Employment Action Taken Against Plaintiff Was the Termination of Her Employment"). That said, the parties disagree on whether on not the lunch break/hours issue was an adverse employment action.

Plaintiff contends that because she was subjected to the wrong lunch policy by Bankhead, she "consistently worked extra hours in order to make up for taking a lunch." Pl. Br. [97] at 15. She also asserts that she "was forced to . . . use vacation

28

time that she would not have otherwise had to use. Being forced to use her vacation time resulted in her a [*sic*] loss of payment for unused time in her final paycheck[.]" *Id.* at 16. In addition, she contends that "it was QA's unwritten policy that when an employee is working extra hours, they are rewarded with extra time off[, so] Plaintiff's extra hours spent working went unnoticed because she attempted to accommodate Bankhead's inaccurate lunch policy on her timesheet." *Id*. She points out that "Ramey admitted Plaintiff worked more hours than she did[.]" *Id.* at 17.

Defendants counter that "not one of her assertions are supported by a citation to evidence or any legal authority that would deem the allegations as adverse employment actions." D. Reply [114] at 7. Defendants also contend that

> contrary to Plaintiff's unsupported assertions, there was no policy at QA that allowed employees to "bank" hours to use at a later date, there is no evidence that Plaintiff was "forced" to use vacation time, her final paycheck proves that Plaintiff was paid her unused vacation time, the company's Daily Sign In/Out logs show that even when Plaintiff took a lunch break she typically worked less than 8 hours per day, and whether or not Plaintiff worked more hours than Ms. Ramey is irrelevant because both were salaried employees whose pay did not vary based on hours worked.

*Id.* at 7-8 (internal citations omitted).

Defendants are incorrect. To establish an "adverse employment action," an employee must prove that:

> a decision of the employer "impact[ed] the terms, conditions, or privileges of [her] job in a real and demonstrable way." This "impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." The "employee must show a serious and material change in the terms, conditions, or privileges of employment" so that a "reasonable person

in the circumstances" would find "the employment action [to] be materially adverse."

*Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920-21 (11th Cir. 2018) (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)). Several courts have found that having to work more hours to be entitled to the same pay can constitute an adverse employment action. *See Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006) ("if Centocor requires women (or older workers) to work longer hours than men (or younger workers) to obtain the same remuneration, that material difference also is discriminatory and violates federal law"); *Menuel v. Hertz Corp.*, No. 1:07-CV-3031-JTC, 2009 WL 10666086, at *3 (N.D. Ga. Jan. 23, 2009) (finding that an "allegation that Plaintiff has received a lower hourly wage as a result of preferential treatment on the basis of religion satisfies the adverse employment action requirement" where plaintiff alleged that prayer breaks given to Muslim employees meant that "non-Muslim employees must work up to 2.5 more hours per day to receive the same pay as Muslim employees"); *Hunter v. Army Fleet Support*, 530 F. Supp. 2d 1291, 1295 (M.D. Ala. 2007) (finding that the disproportionate assignment of "dirty bird" helicopters to an all Black helicopter maintenance crew could "could constitute an adverse-employment action" where "[d]irty birds take longer to work on than clean birds, with the result that a crew with an over-assignment of dirty birds could . . . have to work longer hours to receive the same pay as their peers"). Here, the root of Plaintiff's argument is that she was required

30

to work longer hours to earn her salary than Ramey was. The Court has no difficulty finding that that is an adverse employment action. The Court is unpersuaded by Plaintiff's argument that, as salaried employees, the number of hours worked was irrelevant—if that were truly the case, then Bankhead's instruction about making up for lunch breaks would be nonsensical.

(ii)     Ramey as a Comparator

The parties vigorously dispute whether or not Ramey can be considered Plaintiff's comparator. In *Lewis v. City of Union City*, the Eleventh Circuit clarified how the courts are to assess comparison evidence for plaintiffs proceeding under the *McDonnell Douglas* framework. 918 F.3d 1213, 1221-24 (11th Cir. 2019) (*en banc*). Evidence that an employer "has treated 'like' employees 'differently'" is often necessary to "supply the missing link and provide a valid basis for inferring unlawful *discrimination*" through use of the framework. *Id.* at 1223 (emphasis in original). A plaintiff is "like" other employees only when "she and her comparators are 'similarly situated in all material respects.'" *Id.* at 1224. While a plaintiff need not show that she and her comparator are "nearly identical" in their circumstances, they should be similar in the legitimate circumstances that may have factored into their employer's decision to act adversely toward them, such as their conduct or misconduct, their work histories, and the policies under which they operate. *See id.* at 1225-28. Further, proper comparators "will ordinarily (although not invariably) have been

under the jurisdiction of the same supervisor as the plaintiff[.]" *Id.* at 1227-28. Without a proper comparator, a plaintiff cannot generally establish a *prima facie* case under the *McDonnell Douglas* framework. *See id.* at 1223-24.

Plaintiff argues that she and Ramey were "similarly situated in all material respects[,]" noting that both "were supervised by Defendant Bankhead[,]" "were hired as Content Developers[,]" "were subject to the same . . . workplace rules or policies[,]" and "shared the same [non-existent] disciplinary history[.]" Pl. Br. [97] at 14-15.

Defendants argue that Ramey and Plaintiff were not similarly situated because they had different supervisors (Adkins and Bankhead respectively) until February 2016. MSJ [85] at 19. Moreover, even when Bankhead became Ramey's supervisor, "there were no discussions between Ms. Bankhead and Ms. Ramey about lunch breaks," so "there is no evidence that Ms. Bankhead had anything to do with the difference in how Plaintiff or Ms. Ramey understood QA's lunch break policy." *Id.* at 19-20. Defendants also note that "Plaintiff has no evidence to suggest that Ms. Ramey was her comparator with respect to any claim related to work performance, as Ms. Ramey always met her deadlines, turned in complete work, and was available any time QA management needed her." *Id.* at 20.

Defendants are probably right that before Bankhead was the direct supervisor of both Ramey and Plaintiff, they were not similarly situated, but they ultimately

*were* both supervised by Bankhead. The fact that there were no discussions between Bankhead and Ramey does not somehow defeat comparator status. In fact, that is Plaintiff's theory of discrimination. There can be no dispute that Plaintiff and Ramey should have been subject to the same policy. That Bankhead, after becoming Ramey's supervisor, said nothing to Ramey about Ramey's practice of counting her lunch hour as working time, after having told Plaintiff that Plaintiff would be "stealing" from the company for doing just that, is the very disparate treatment that Plaintiff alleges. That Bankhead may not have initially been Ramey's supervisor does not explain this difference in supervision. Thus, the Court finds that Plaintiff and Bankhead were similarly situated with respect to the lunch policy.

The comparison between Plaintiff and Bankhead is less apt when it comes to Plaintiff's termination, and it does not appear that Plaintiff attempts to argue otherwise. Even setting aside the hotly disputed performance issues, at the meeting between Plaintiff and Bankhead about the lunch break issue, Plaintiff spoke in a very loud voice and yelled at Bankhead. Plaintiff herself argues that she was terminated in substantial part because of her May 20 complaint. *See* Pl. Br. at 27 (noting that "Quality Assist admitted that Ms. Kimble's 'outburst' about being treated differently was the final straw that caused QA to terminate her one day later"). There is no allegation that Ramey was ever involved in any such perceived attitude problems. Thus, she is not similarly situated to Plaintiff with respect to termination. *See Smelter*

*v. Southern Home Care Servs.*, 904 F.3d 1276, 1292 (11th Cir. 2018) (finding that plaintiff "was not similarly situated to [certain co-workers] and [could not] rely on them as comparators" where unlike plaintiff, the co-workers "were never accused of instigating an altercation with a co-worker"). Thus, Plaintiff has stated a *prima facie* case with respect to the unequal requirements as to hours, but not the termination.

(3)    Legitimate Reason

As explained above, upon the showing of a *prima facie* case of discrimination, the *McDonnell Douglas* framework requires that an employer must articulate a legitimate, nondiscriminatory reason for the adverse action of which a plaintiff complains. This is an "exceedingly light burden"—the employer's "burden is 'merely one of production, not proof.'" *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983) (quoting *Lee v. Russell Cty. Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982)). "So long as the employer articulates a 'clear and reasonably specific' non-discriminatory basis for its actions, it has discharged its burden of production." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769-70 (11th Cir. 2005) (*per curiam*) (quoting *Burdine*, 450 U.S. at 254-55).

Defendants contend that Bankhead simply made a mistake with respect to the lunch break issue, and cite Bankhead's own adherence to the incorrect policy as evidence that the mistake was an honest one. MTD [85] at 20-21. While that might explain why she imposed the policy on Plaintiff, it does not explain why she failed

34

to impose the policy on Ramey, who was not following the policy and admitted she was working fewer hours than Plaintiff. Whether Bankhead believed the policy to be true, or not, or whether she was mistaken in that belief, or not, does not address the basic allegation, that is, that Bankhead did not evenly apply this policy to Ramey and Plaintiff. Similarly, as addressed above, the fact that Bankhead was not Ramey's initial supervisor does not explain why Bankhead failed to evenly apply the perceived hours requirement to Ramey during the time that Bankhead was her supervisor. Bankhead may not have been the one to initially explain the rules to Ramey, in other words, but that does not explain why Bankhead would not have evenly enforced those rules for all that were under her supervision, which eventually included Ramey. Accordingly, Defendants have not met their burden.

### (4)   Convincing Mosaic

A "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Lewis*, 934 F.3d at 1185 (quoting *Smith*, 644 F.3d at 1328). "Even without similarly situated comparators, 'the plaintiff will always survive summary judgment if he [or she] presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Id.* (quoting *Smith*, 644 F.3d at 1328). Accordingly, "a plaintiff will always survive summary judgment if he [or she] presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Id.* (quoting *Smith*, 644 F.3d at 1328) (internal

quotation marks omitted). "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (internal quotation marks omitted).

As discussed above, Plaintiff has established a *prima facie* case of discrimination with regard to the unequal hours to which she was subjected as compared to Ramey, but has not established a *prima facie* case of discrimination as it relates to her termination. Thus, to establish a triable issue of fact as to discriminatory termination, Plaintiff must present a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination regarding the termination.

Plaintiff points to a litany of allegations that she contends make up a convincing mosaic of circumstantial evidence. *See* Pl. Br. [97] at 19-25. Plaintiff first argues that "Defendants used a plethora of racist stereotypes to describe Plaintiff's work performance, disposition and behavior." *Id.* at 19. But the statements that Plaintiff cites merely describe Plaintiff as "angry," "upset," "defensive," "argumentative" and "inflammatory." *Id.* at 19-20. Plaintiff cites no factual or legal authority for considering these general statements to be akin to racial tropes or strong

stereotypes that could themselves be evidence of discrimination. *Cf. Banks v. Marketsource, Inc.*, No. 1:18-CV-2235-WMR-JSA, 2019 WL 8277274, at *15 (N.D. Ga. Dec. 5, 2019) (comments such as "it smells foul in here" after an African American employee walked into room, and asking her whether she had "rats, roaches, or mice" in her home, could be interpreted as a racial trope), *report & rec. adopted by* 2020 WL 6291422 (N.D. Ga. Mar. 20, 2020).

Plaintiff also argues that Bankhead—who allegedly displayed racial bias in subjecting Plaintiff to different working hours requirements than Ramey—heavily influenced Sibley's view of Plaintiff and eventual decision to termination Plaintiff. According to Plaintiff, Bankhead let Sibley believe that Plaintiff was responsible for poor work product when it was, in fact, Bankhead's own work product that was deficient. Plaintiff perceived that Bankhead was "overly critical" of her, and set unfair and arbitrary deadlines about which she did not always inform Plaintiff, and did not advise Sibley that Plaintiff's failure to meet these deadlines was not Plaintiff's fault. Pl. Br. [97] at 22-23.

The problem with Plaintiff's arguments in this regard is that Plaintiff's own perception that she was unfairly treated by Bankhead, and/or that Bankhead allowed Plaintiff to be blamed for Bankhead's own failings, does not in itself suggest discrimination. A poor, unfair or even self-promoting supervisor is not necessarily a racist one. Notably, Plaintiff does not produce any comparator evidence as it relates

to her substantive supervision of Plaintiff. Also, it is very difficult to suggest that Bankhead's alleged animus was responsible for the termination decision, when Defendants offer undisputed evidence that Bankhead on multiple occasions convinced Sibley *not* to fire Plaintiff and instead allow Bankhead to continue to work with and help Plaintiff improve. *See* DSMF ¶¶ 141-142. Indeed, even after Sibley made the ultimate decision to fire Plaintiff on May 20, 2016, Bankhead insisted that she (Bankhead) was willing to continue working with Plaintiff. *Id*. ¶ 151.

Additionally, Plaintiff contends that "QA blamed the only African American, Plaintiff, for everything that was wrong[,]" despite the work product being a team effort. Pl. Br. [97] at 23-24. This argument misstates the record and is meritless because Plaintiff was not the only African American on her team. Gillian Lee-Fong, who is African American, was on Plaintiff's team for a significant portion of the relevant period, DSMF ¶¶ 20-21, but Plaintiff inexplicably ignores this fact.

As further evidence of discrimination, Plaintiff contends that she "was replaced by two white females, Bankhead and Ramey." Pl. Br. [97] at 24. In support of this proposition, she cites testimony from Bankhead, but that testimony does not say what she suggests it does. The testimony reads:

> **Q**:   So who took over [Plaintiff's] work after she was fired?
> **A**:   I did her work. We all pitched in and did the work.
> **Q**:   Who is we all?

**A**:    I did most of it, and I might have hired somebody from outside to help write manuscripts. I can't recall exactly. It was too long ago what happened. Gillian Lee-Fong was helping, as well.

**Q**:    What about Ramey?

**A**:    Ramey eventually started writing manuscripts for courses too.

Bankhead Dep. [88] at 262:19-263:5; *see also* DeMars Dep. [90] at 116:8-9 ("I don't believe we hired for a long time for that position."). Thus, the Court easily rejects Plaintiff's unsupported assertion that she "was replaced by two white females." To the contrary, the testimony merely states that the work was handled by the remaining members of the team, which also happened to include Lee-Fong (who is African-American).

Plaintiff also argues that she had not previously received any negative performance evaluations or warnings that she could be fired for performance-related reasons. But evidence arguably casting doubt on an employer's reasons for termination—that is, evidence of pretext—does not necessarily by itself suggest discrimination. Under the *McDonnell-Douglas* approach, after all, the analysis of pretext only comes into play after a plaintiff has already shown a *prima facie* case of discrimination, which Plaintiff has not done. Further, Plaintiff was not terminated simply for performance-related reasons. Defendants have offered evidence that Sibley terminated Plaintiff because of a combination of circumstances including Plaintiff's performance, her attitude (e.g., focusing on hours as opposed to professionally getting the work done), and the events of May 20.

Thus, the undersigned **RECOMMENDS** that the Motion for Summary Judgment [85] be **DENIED** as to Counts III and V, and Plaintiff be allowed to proceed to trial on the theory that she was subjected to different terms and conditions of employment (that is, her hours), but not on the theory of wrongful termination.

> d.    Retaliation

Defendants request summary judgment as to retaliation because Plaintiff has not presented evidence that she engaged in a statutorily protected activity. MSJ [85] at 25-27. Plaintiff responds that "when she complained about being treated differently than Ramey and that she wanted to be treated the same as Ramey, she meant because of race since she was the only African American supervised by Bankhead who was treated differently than her white coworker Ramey." Pl. Br. [97] at 28. She also argues that she "must show only that she held a good faith, reasonable belief that she was being treated differently and unfairly because of her race and held a good faith belief that discrimination existed." *Id.* (citing *Jefferson*, 891 F.3d at 924; *Bryant v. United States Steel Corp.*, 428 F. App'x 895, 898 (11th Cir. 2011); *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989)).

A plaintiff alleging unlawful retaliation must show that she engaged in a protected activity or expression under Title VII or § 1981 through evidence of either opposition to a practice made unlawful under Title VII or § 1981 or participation in

an investigation, proceeding, or hearing regarding such a practice. *See* 42 U.S.C. § 2000e-3(a). To maintain a claim for retaliation against opposition to an unlawful practice, "the employee must . . . , 'at the very least, communicate her belief that discrimination is occurring to the employer,' and cannot rely on the employer to 'infer that discrimination has occurred.'" *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (quoting *Webb v. R & B Holding Co.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998)). Communicating a belief of discrimination is more than just complaining about general mistreatment. *See Smith v. Mobile Shipbuilding & Repair, Inc.*, 663 F. App'x 793, 800 (11th Cir. 2016) (*per curiam*) (distinguishing between complaints of racial discrimination and those of "general unfair treatment in the workplace"). An employee "must reasonably convey that she is opposing discrimination based specifically on race, versus some other type of discrimination or injustice generally." *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1354 (N.D. Ga. 2017).

Here, Plaintiff's statements fall short of constituting protected activity. As detailed above, Defendants point out that "Plaintiff never expressed to Ms. Bankhead, Ms. Mow, or Ms. Demars that she felt that she was being treated differently at QA *because of her race*." DSMF ¶ 137 (emphasis added). Plaintiff denies Defendants' statement, but none of the evidence she cites contradicts it. *See* PRDSMF ¶ 137. In fact, some of testimony that she cites is part of an exchange that

*supports* Defendants' point. *See* Kimble Dep. [96] at 98:15-99:9 ("**Q:** The question was during the meeting with Ms. Bankhead, you told her other people noticed that she was treating you and Melissa [Ramey] differently. Is that correct? **A:** Yes. **Q:** Is that right? Okay. You didn't say anything about race . . . Is that correct? **A:** When I said differently, it was because of that difference because . . . Melissa Ramey and Tracey Bankhead are both Caucasian, heterosexual women. And I am an African-American, homosexual woman. And that is different than those two are. **Q:** But you didn't say that to Ms. Bankhead. You just said differently. Is that correct? **A:** It was differently, and I was insinuating that."). All Plaintiff can muster is an assertion that "she *meant* because of race[.]" Pl. Br. [97] at 28. But without any direct reference to race or any context making clear that she was tying her alleged mistreatment to her race, Plaintiff's complaints did no more than convey her belief that she was the victim of general unfair treatment which, "absent discrimination based on race . . . is *not* an unlawful employment practice[.]" *Coutu v. Martin Cty. Bd. of Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (*per curiam*) (emphasis in original). Because her statements did not convey a belief of unlawful discrimination, they cannot constitute protected activity. *See Suber v. Lowes Home Ctrs.*, 845 F. App'x 899, 900 (11th Cir. 2021) (*per curiam*) (finding that an employee's email complaining of general unfair treatment without any mention of a protected characteristic did not constitute protected activity); *Banks*, 2019 WL 8277274, at *17-18 (finding that an

employee's complaints about a supervisor's behavior towards her in comparison to her colleagues did not constitute protected activity under Title VII or § 1981 because she did not "reference[ ] [her colleagues'] race or ma[k]e any suggestion as to why" her supervisor was allegedly singling her out).

Plaintiff's argument that she "must show only that she held a good faith, reasonable belief that she was being treated differently and unfairly because of her race and held a good faith belief that discrimination existed" is misguided and misstates the law. The line of cases Plaintiff cites stands for the proposition that if an employee *complains* of unlawful treatment, but it turns out the treatment was not in fact unlawful, the complaint can still constitute protected activity. *See, e.g., Jefferson*, 891 F.3d at 924 (11th Cir. 2018) ("An employee's complaint about discrimination constitutes protected activity if the employee could reasonably form a good faith belief that the alleged discrimination existed." (internal quotation marks omitted)); *Taylor*, 175 F.3d at 869 (11th Cir. 1999) (Plaintiff's "activity in filing the discrimination claim is protected because she filed it in good faith believing that the discrimination actually existed.") In other words, the "good faith belief" applies to unlawfulness of the conduct underlying the complaint—but there still needs to be a complaint of unlawful conduct.

Because Plaintiff failed to show that she engaged in protected activity or expression, she cannot show that she was subject to unlawful retaliation under Title

VII or § 1981. Accordingly, the undersigned **RECOMMENDS** that the Motion for Summary Judgment [85] be **GRANTED** as to Counts IV and VI.

### III.    CONCLUSION AND RECOMMENDATION

Plaintiff's Page Limit Motion [99], Late Exhibits Motion [109], and Clerical Correction Motion [111] are **GRANTED**. Additionally, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [85] be **GRANTED** as to Counts I, II, IV, and VI, but **DENIED** as to Counts III and V on the basis discussed above.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO ORDERED AND RECOMMENDED** this 15th day of November, 2021.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE