UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

APRIL KIMBLE,

       Plaintiff,

    v.

QUALITY ASSIST, INC. and
TRACEY BANKHEAD,

       Defendant.

CIVIL ACTION NO.
1:19-cv-02549-JPB

## ORDER

This matter is before the Court on the Magistrate Judge's Final Report and

Recommendation ("Report"). ECF No. 120. Having reviewed and fully

considered the Report and related filings, the Court finds as follows:

## I.     BACKGROUND[1]

Plaintiff April Kimble's ("Kimble") complaint alleges claims against

Defendants Quality Assist, Inc. ("QA") and Tracey Bankhead ("Bankhead")

(collectively "Defendants") under the Civil Rights Act of 1866, 42 U.S.C. § 1981,

---

[1] The Report provides a comprehensive description of the relevant undisputed facts, so the Court will provide only a summary here. The Magistrate Judge made certain decisions regarding which facts are considered undisputed. For example, the Magistrate Judge accepted as true facts that Kimble failed to dispute with citations to the record. The Court has reviewed those decisions and agrees with them.

and Title VII of the Civil Rights Act of 1964 ("Title VII") as follows:  Count I
(discrimination under Title VII (sexual orientation)); Count II (retaliation under
Title VII (sexual orientation)); Count III (discrimination under Title VII (race));
Count IV (retaliation under Title VII (race)); Count V (race discrimination under §
1981); Count VI (retaliation under § 1981).  In a nutshell, Kimble claims that she
suffered discrimination on the basis of race while employed at QA, and she was
terminated for discriminatory reasons and in retaliation for complaining about
discrimination.[2]

The record shows that Kimble is an African American female who was hired
by QA on September 24, 2015, as a Content Developer II/Subject Matter Expert.
Her job duties consisted of subject matter research, writing for an E-learning
platform and writing online learning modules.  Bankhead, a white employee who
had been at QA since 1998, was Kimble's immediate supervisor.

In October 2015, Kimble and Bankhead had a conversation about whether
employees were required to stay later at work if they took a lunch break (the
"Lunch Break Policy").  Bankhead directed Kimble to record only the hours that
she actually worked on her time sheet and not to include time taken for lunch.

---

[2] Kimble does not contest that summary judgment is appropriate as to her sexual
orientation discrimination claims, so the Court will address only the race
discrimination claims here.

Bankhead, herself, followed this policy and told Kimble that if she did not work an extra hour after taking an hour-long lunch break, she would be "stealing" from the company.

Melissa Ramey, who is white, was hired in August 2015 as a Content Developer II/Subject Matter Expert, like Kimble. Ramey's direct supervisor was Michelle Adkins from the beginning of Ramey's employment until Adkins left QA in February 2016.

After Adkins left, Bankhead became Ramey's supervisor. Ramey and Kimble were on the "Content Team" with Bankhead. Since they were both salaried employees, the number of hours they worked did not impact how much they were paid.

Bankhead never told Ramey that she had to make up the time she took for a lunch break, and Ramey neither worked extra time to make up for lunch breaks nor understood that she needed to do so. Ramey agrees that Kimble worked more hours than she did.

Kimble states that Bankhead constantly surveilled her whereabouts by always asking where she was via text, even when she was using the restroom, whereas Ramey moved freely in the office without Bankhead constantly looking

for her.  Kimble eventually put a sign on her desk letting Bankhead know when she was in the restroom.

Defendants assert that it was necessary to monitor Kimble because she was frequently away from her desk, whereas Ramey attended meetings on time and was never difficult to find in QA's offices.

Sometime before May 20, 2016, Kimble learned from Susan Mow, a human resources employee, that employees were not required to make up time spent on lunch breaks.  Mow thereafter spoke with Bankhead and corrected Bankhead's understanding regarding the Lunch Break Policy.  Defendants maintain that Bankhead apologized to Kimble for providing wrong information about the policy, but Kimble denies this.

On Friday, May 20, 2016, Kimble emailed Bankhead to ask why Bankhead told her that she had to make up time spent on lunch and did not tell Ramey the same thing.  Bankhead responded, "Come see me now."

At the meeting Kimble spoke in a very loud voice and yelled at Bankhead. She told Bankhead that other people thought Bankhead was treating her "differently" than Ramey.  Kimble asserts that she meant "differently" due to race since she is African American and Ramey is white.  However, Defendants contend that Kimble never expressed to anyone at QA that she felt she was being treated

differently due to her race.  Kimble has not alleged that anyone at QA made comments (verbal or written) to her regarding her race.

After speaking with Bankhead, Kimble went to Mow's office to complain about Bankhead treating her and Ramey differently.  Upon overhearing Kimble, who sounded upset and was using a louder than usual voice, and speaking with Bankhead, Vice President Kim-Tai DeMars ("DeMars") joined the meeting. DeMars sent Kimble home for the rest of the day, so she could calm down and collect herself.  Mow, DeMars and Bankhead then met with QA's CEO, Dr. Annette Sibley ("Sibley").

Sibley terminated Kimble the following Monday.  She told Kimble that her financial and professional development needs were too great, and she was not a fit with QA.  Sibley testified that she had run out of patience with Kimble based on past occurrences.  She stated that she terminated Kimble due to poor performance over the course of many months, including missed deadlines and work deficiencies that disrupted the work of colleagues and caused contract delays with clients. Sibley maintains she was also concerned about Kimble's focus on the lunch break issue, even though she was a salaried employee, who was expected to work whatever hours were necessary to get the work done.

Defendants assert that Sibley was never informed of Kimble's allegations that she was being treated differently than Ramey and that Sibley did not consider input from Bankhead or anyone else when she decided to terminate Kimble. According to Defendants, after Sibley decided to terminate Kimble, Bankhead told Sibley that she was still willing to work with Kimble. Defendants also assert that Sibley and DeMars expressed that Kimble should be terminated for performance issues on several occasions in early 2016, but Bankhead asked to continue working with her to see if she could improve.

Kimble denies that her performance was poor. She states that during her six-month review in March 2016, Bankhead told her that she was a "great" employee.

Kimble, however, contends that Bankhead was "hypercritical" of her performance. She also states that Bankhead often changed deadlines without notice and allowed Sibley to believe that Kimble always knew about the deadlines in advance. Kimble disputes that Sibley was planning to terminate her before she complained about Bankhead.

Kimble asserts that Bankhead's incorrect communication regarding the Lunch Break Policy caused her to lose the opportunity to earn more vacation hours. She explains that it was QA's policy to award additional time off to

employees who worked extra hours, but she was not eligible for additional time off because the deductions in her timesheets for lunch breaks caused an underreporting of the time she actually spent working.  She also contends that she had to needlessly burn her vacation hours (apparently because she used vacation time to make up for lunch hours) and therefore received a lower payout for unused vacation hours when she was terminated.

Although Defendants dispute that QA had a policy that allowed employees to "bank" hours for later use, and they argue that there is no evidence that Kimble was forced to use vacation time, Kimble's testimony supports her contentions, and testimony cited by both parties shows that employees who worked longer hours could be rewarded with leave.

The Magistrate Judge recommends denying summary judgment as to Kimble's Lunch Break Policy discrimination claims and granting summary judgment as to Kimble's discriminatory termination and discriminatory retaliation claims.

Specifically, the Magistrate Judge recommends allowing Kimble's discrimination claim regarding the Lunch Break Policy to proceed because the Magistrate Judge found that (i) Kimble suffered an adverse employment action by having to make up the time taken for her lunch breaks; (ii) Ramey was a similarly

situated comparator since she and Kimble worked for the same supervisor, had the same job title and worked under the same terms of employment; and (iii) Defendants did not offer a legitimate reason for administering the policy differently.[3]

The Magistrate Judge recommends dismissing Kimble's discriminatory termination claim because he found that Ramey is not a similarly situated comparator in terms of Kimble's termination.  He explained that even if the disputed work performance issues are set aside, there is no allegation that Ramey had conduct issues, such as speaking in a loud voice or yelling at Bankhead.  The Magistrate Judge also was not convinced that Kimble presented a convincing mosaic of other evidence of discrimination.  For example, he found that Kimble cited no "factual or legal authority" for considering certain "general statements" Defendants made to constitute racial tropes.  He also stated that the record did not support Kimble's claim that she was replaced by two white females because her work was simply distributed among her team members, who happened to be two white females.

---

[3] The parties do not dispute that Kimble is a member of a protected class or that she was qualified for the job.

The Magistrate Judge recommends dismissing Kimble's retaliation claim because he found that Kimble did not show that she referred to race when she complained about mistreatment and did no more than convey her belief that she was the victim of general unfair treatment.

## II.   **DISCUSSION**

A district judge has broad discretion to accept, reject or modify a magistrate judge's proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 680 (1980).  Pursuant to 28 U.S.C. § 636(b)(1), the Court reviews any portion of the Report that is the subject of a proper objection on a *de novo* basis and any portion to which there is no objection under a "clearly erroneous" standard.

A party objecting to a recommendation "must specifically identify those findings objected to.  Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).  "This rule facilitates the opportunity for district judges to spend more time on matters actually contested and produces a result compatible with the purposes of the Magistrates Act." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009).

Notably, "a district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge." *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009).  Citing similar conclusions from sister circuits, the Eleventh Circuit Court of Appeals has explained that "'requir[ing] a district court to consider evidence not previously presented to the magistrate judge would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court.'" *Id.*  Further, "'[s]ystemic efficiencies would be frustrated and the magistrate judge's role reduced to that of a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round.'" *Id.*

## A.   <u>Legal Standard</u>

"Summary judgment is appropriate when the record evidence, including depositions, sworn declarations, and other materials, shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Fed. R. Civ. P. 56) (quotation marks omitted).  A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642,

646 (11th Cir. 1997). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Ultimately, "[t]he basic issue before the court . . . is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen*, 121 F.3d at 646 (citation omitted).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.*

After the movant satisfies this initial burden, the nonmovant bears the burden of showing specific facts indicating summary judgment is improper because a material issue of fact does exist. *Id.* In carrying this burden, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

In sum, if the record taken as a whole cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### B.   Analysis

The parties' objections boil down to whether the Magistrate Judge correctly concluded that:  (i) Kimble did not engage in protected activity that could support her claim of retaliation; (ii) Kimble established a *prima facie* case of discriminatory treatment regarding the lunch break issue but failed to establish a *prima facie* case of discriminatory termination; and (iii) Defendants failed to offer a legitimate reason for the different application of the Lunch Break Policy.

### 1.   Whether Kimble engaged in protected activity

The Magistrate Judge recommends dismissing Kimble's retaliation claims because he found that Kimble did not engage in protected activity.

Kimble objects to this finding because she argues that she engaged in protected activity by complaining that Bankhead was treating her "differently." She reiterates that she meant due to race.

Defendants respond that Kimble did not engage in protected activity because she did not elaborate that she believed she was being treated differently due to her race.

In *Smith v. Mobile Shipbuilding & Repair, Inc.*, the Eleventh Circuit explained that complaints of harassment and of "general unfair treatment in the workplace" do not necessarily equate to complaints of racial discrimination where the plaintiff does not attribute the conduct to discrimination.  663 F. App'x 793, 800 (11th Cir. 2016) (affirming summary judgment where the employee complained only that his supervisor was "riding him and harassing him"); *see also Demers v. Adams Homes of N.W. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (stating that "to engage in protected activity, the employee must   . . . 'at the very least, communicate her belief that discrimination is occurring to the employer,' and cannot rely on the employer to 'infer that discrimination has occurred'" (quoting *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998))).  In short, an employee "must reasonably convey that she is opposing discrimination based specifically on race, versus some other type of discrimination or injustice generally." *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1354 (N.D. Ga. 2017).

Applying this reasoning here, the Court agrees with the Magistrate Judge that because Kimble did not connect her treatment to race, her complaint that she was treated "differently" is akin to a complaint of general unfair treatment. Kimble's objection that implicit in the use of the word "differently" is a claim of

racial discrimination because Ramey is white does not square with the law. QA is not expected to draw such an inference. Therefore, Kimble's complaint does not constitute protected activity for the purposes of a retaliation claim.

Accordingly, Kimble's objection as to Counts IV and VI of the complaint are overruled.

> **2.   Whether Kimble established a *prima facie* case of discrimination regarding the Lunch Break Policy and her termination**

The Magistrate Judge concluded that Kimble established a *prima facie* case of discrimination regarding the Lunch Break Policy but failed to establish a *prima facie* case with respect to her termination claim.

**The Lunch Break Policy**

The Magistrate Judge concluded that Kimble established a *prima facie* case of discrimination regarding the Lunch Break Policy because he found that (i) Kimble suffered an adverse employment action by having to make up the time taken for her lunch breaks and potentially losing the opportunity to earn extra vacation hours; (ii) Ramey was a similarly situated comparator since she and Kimble worked for the same supervisor, had the same job title and worked under the same terms of employment; and (iii) Bankhead treated Kimble differently than Ramey regarding the Lunch Break Policy.

14

Defendants challenge these findings because they argue that: (i) Count III of the complaint does not include allegations regarding the lunch break issue, and the Magistrate Judge incorrectly expanded his analysis of that count to include the lunch break issue; (ii) the Magistrate Judge improperly considered Ramey as a comparator and looked at the wrong time period; (iii) Bankhead did not communicate the incorrect policy to another African American employee on the team; and (iv) Kimble did not offer evidence to support her arguments, including that she was required to work additional hours or use vacation hours to make up for lunch breaks.

Kimble responds that the Magistrate Judge properly considered Count III of the complaint as encompassing the lunch break issue because Count III specifically alleges that Kimble was subjected to different terms and conditions of employment, which would include the lunch break issue. Kimble further asserts that the record contains evidence on each element of her claim, including as to the vacation hours issue and the appropriateness of Ramey as a comparator.

A plaintiff may establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action by her employer; (3) she was qualified to do the job in question; and (4) her employer treated similarly situated employees outside her

protected class (*i.e.*, those of a different race) more favorably than it treated her. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  A plaintiff may also defeat a motion for summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

As applicable to the objections raised here, the Court addresses the second (adverse employment action) and fourth (disparate treatment) prongs of the *McDonnell Douglas* analysis.[4]

*Adverse Employment Action*

The Court finds that Kimble was subject to an adverse employment action with respect to the application of the Lunch Break Policy.  Viewing the facts in the light most favorable to Kimble, the record reflects that Bankhead told her that she needed to make up the time she spent on lunch breaks, and she consistently worked extra hours or was forced to use vacation hours to make up the time.

---

[4] The Court finds that the Magistrate Judge properly considered the Lunch Break Policy issue under Count III of the complaint because, as Kimble points out, Count III specifically alleges that Kimble was subjected to different "terms and conditions" on account of race.

Kimble also testified that she did not get credit for the extra hours she worked because she allotted those hours to satisfy the incorrectly communicated Lunch Break Policy.  Therefore, she missed the opportunity to be rewarded with additional leave for the extra time she worked.  This real and demonstrable impact on the terms, conditions and privileges of her employment, *see Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920–21 (11th Cir. 2018), constitutes adverse action.

Defendants' dispute regarding the evidence supporting Kimble's assertions are not for the Court to resolve on summary judgment.  Accordingly, the Court finds that Kimble has shown an adverse employment action with respect to the application of the Lunch Break Policy, and Defendants' objections as to this issue are overruled.

*Disparate Treatment*

The Court agrees with the Magistrate Judge that Ramey is a similarly situated employee for the purposes of Kimble's lunch break claim and that Kimble was treated differently as compared to Ramey.

In *Lewis v. City of Union City*, the Eleventh Circuit held that "a plaintiff needn't show that she and her comparators were 'nearly identical.'  Instead, she must demonstrate . . . that she and her comparators are 'similarly situated in all material respects.'"  918 F.3d 1213, 1229 (11th Cir. 2019) (citation omitted).  The

17

court provided examples of a valid comparator, including a colleague who "engaged in the same basic conduct (or misconduct) as the plaintiff;" was "subject to the same employment policy, guideline, or rule as the plaintiff;" was "under the jurisdiction of the same supervisor;" and "share[d] the plaintiff's employment or disciplinary history." *Id*. at 1227–28.

Here, the record shows that Kimble and Ramey were both supervised by Bankhead; they were both hired as Content Developers; they were both subject to the same workplace rules and policies (even though Bankhead applied the Lunch Break Policy differently to Kimble); and they both lacked a disciplinary history. The Court is not persuaded by Defendants' objection that Ramey is not an appropriate comparator because she initially had a different supervisor. Both Ramey and Kimble were eventually supervised by Bankhead at the same time, and Bankhead applied the incorrect lunch policy only to Kimble during that time.

Further, the record is not clear whether Kimble was the only minority employee treated differently on the lunch break issue. And even if it were, the fact would still remain that Kimble was treated differently as compared to Ramey.

As such, Defendants' objection that Ramey is not a suitable comparator with respect to the lunch break issue is overruled.

**The Termination**[5]

The Magistrate Judge concluded that Kimble did not establish a *prima facie* case of discriminatory termination because he found that Ramey was not a similarly situated comparator in this regard.  In the Magistrate Judge's view, even if the disputed performance issues are set aside, Ramey still does not qualify as an appropriate comparator because there is no evidence that Ramey had "perceived attitude problems" or engaged in conduct, such as yelling at Bankhead.

The Magistrate Judge also was not convinced that Kimble presented a convincing mosaic of other evidence of discrimination.  For example, he found that Kimble cited no "factual or legal authority" for considering certain "general statements" Defendants made to constitute racial tropes.  He also stated that the record did not support Kimble's claim that she was replaced by two white females because her work was simply distributed among team members, who happened to be two white females.

Kimble objects to the Magistrate Judge's conclusions because she argues that he resolved disputed facts in Defendants' favor, including that she was

---

[5] Defendants do not dispute that Kimble's termination was an adverse employment action, so the Court focuses on the issue of disparate treatment—specifically whether Ramey is a suitable comparator to Kimble for the purposes of Kimble's termination claim.

terminated partly due to her performance and her attitude.  She also contends that the evidence regarding her performance and attitude should be disregarded because it was offered by "interested witnesses."  Kimble insists that Defendants used racial stereotypes to describe her work.

In response, Defendants contend that there is evidence in the record regarding Kimble's performance issues and that their description of her performance was based on personal observation, not racial stereotypes. Defendants also point out that courts in this circuit credit evidence from so-called interested witnesses.  Finally, Defendants argue that the undisputed evidence establishes that Bankhead had nothing to do with Kimble's termination.

Here, the Court agrees that Ramey is not a suitable comparator with respect to Kimble's termination.  In *Smelter v. Southern Home Care Services Inc.*, the court found that an employee whose performance history was the same as the plaintiff's was not a similarly situated employee because the plaintiff had engaged in additional misconduct that preceded her termination.  904 F.3d 1276, 1292–93 (11th Cir. 2018).  Thus, even assuming for the sake of argument that the record lacked evidence of the alleged performance issues that Sibley claims played a role in Kimble's termination, Ramey still would not be a suitable comparator with

respect to Kimble's termination because, unlike Kimble, Ramey is not accused of engaging in additional misconduct, including yelling at Bankhead.

Based on the foregoing analysis, the Court finds that Kimble has not identified a suitable comparator for the purpose of demonstrating disparate treatment and therefore cannot establish a *prima facie* case of discriminatory termination.

Kimble's objections—that the evidence supporting Defendants' framing of the May 20 event came from Defendants; that her behavior on that day does not justify her termination; and that she has otherwise provided evidence of discrimination under the convincing mosaic framework—do not change the Court's conclusion.

As an initial matter, the Eleventh Circuit has expressly rejected the argument that a court cannot rely on the testimony of defendants for summary judgment purposes. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1150 n.24 (11th Cir. 2020). The Court is also "not a 'super-personnel department' assessing the prudence of routine employment decisions, 'no matter how medieval,' 'high-handed,' or 'mistaken.'" *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010)).

Moreover, the Court is not convinced that Kimble otherwise has offered a convincing mosaic of evidence of discrimination that is sufficient to survive summary judgment.  "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." *Jenkins v. Nell*, No. 20-13869, 2022 WL 621147, at *5 (11th Cir. Mar. 3, 2022) (finding that the plaintiff established a convincing mosaic of evidence sufficient to survive summary judgment where a black employee who threatened the supervisor was not discharged, eighteen white operators had resigned from the department, the supervisor mistreated three white operators, he made racially-biased comments, etc.).

In this case, Kimble's mosaic of evidence includes her allegations that Bankhead influenced Sibley's view of Kimble and let Sibley assume missed deadlines were a result of Kimble's poor performance; Bankhead was overly critical of her; Defendants used adjectives to describe her consistent with the racial stereotype of the "Angry Black Woman" (*e.g.*, "furious," "angry," "defensive," "pushy," "argumentative" and "volatile"); QA blamed the only African American on the team for everything that was wrong; she was replaced by two white females;

and she had not received any prior negative performance evaluations.  However, as detailed in the Report and as set forth above, some of these contentions are not supported by the record, and others do not support the inference Kimble draws. For example, the Court is not persuaded that being overly critical of Kimble and referring to Kimble as "angry" or the like, without more, support an inference of discrimination.  Indeed, the plaintiffs in almost all of the cases Kimble cites to bolster her argument regarding racial stereotyping were expressly labeled as "angry black women."

Although the record shows that Bankhead treated Kimble differently than Ramey with respect to the Lunch Break Policy, it is undisputed that Sibley, not Bankhead, made the decision to terminate Kimble and that Bankhead played no role in the termination decision.  Bankhead was willing to continue working with Kimble.  These facts are quite different from *Jenkins*, where the record reflected racial comments and mistreatment as well as excessive turnover of employees of the plaintiff's race, among other things, and the Eleventh Circuit therefore found that the plaintiff had provided a convincing mosaic of evidence of discrimination.

In sum, considering all the evidence, the Court finds that Kimble has not provided a convincing mosaic of evidence on her discriminatory termination claim

to allow her to survive summary judgment and overrules Kimble's objections in this regard.

### 3. Whether Defendants offered a legitimate reason for the different application of the Lunch Break Policy and whether the reason was pretextual[6]

The Magistrate Judge rejected Defendants' proffered reasons for the disparate application of the Lunch Break Policy—that Bankhead was simply mistaken; she, herself, followed the incorrect policy; and she discussed the policy with Kimble only because Kimble asked her a question about it.  The Magistrate Judge pointed out that this does not explain why Bankhead's mistaken belief was not communicated to Ramey.

Defendants object to this conclusion on the ground that the burden of production on the legitimate reason prong is light and is satisfied by merely offering a reason not based on race.  Further, Defendants contend that based on their legitimate reason for the difference in application of the Lunch Break Policy, *i.e.*, Bankhead's mistake, the Magistrate Judge should have reached the pretext prong of the analysis.  They contend that Kimble failed to argue this prong, which would require dismissal of her claims.

---

[6] The Court does not address whether Defendants offered a legitimate reason to terminate Kimble since it found that Kimble failed to establish a *prima facie* case of discriminatory termination.

Kimble counters that the Magistrate Judge correctly found that Defendants did not meet their burden of production because his focus was properly on the uneven enforcement of the Lunch Break Policy, not on Bankhead's mistaken belief of what the policy required.  Kimble also asserts that even though she had no obligation to show pretext because Defendants did not meet their burden to produce a legitimate reason for their decision, she nevertheless demonstrated pretext by showing a convincing mosaic of evidence of discrimination.

Assuming for the sake of argument that Defendants met their burden of production regarding the lunch break issue, the Court finds that there is evidence of pretext in the record sufficient to allow the claim to proceed to a jury.  This includes evidence that Ramey, a similarly situated employee, was not given the same instructions regarding the Lunch Break Policy.  The Court cannot resolve the disputed fact questions surrounding this issue.  For example, a jury could find Bankhead's actions to be evidence of discrimination because there is no explanation of why the two employees she supervised did not work under the same mistaken policy.

Accordingly, Defendants' objections are overruled, and the Court will allow Kimble's discrimination claim regarding the Lunch Break Policy to proceed to the jury.

### III.    **CONCLUSION**

For the above reasons and those stated in the Report, the Court **APPROVES**

**and ADOPTS** the Report (ECF No. 120) as the order of the Court.  Defendants'

Motion for Summary Judgment (ECF No. 85) is **GRANTED** as to Counts I, II, IV

and VI and **DENIED** as to Counts III and V, specifically with respect to Kimble's

Lunch Break Policy claims.

**SO ORDERED** this 21st day of March, 2022.

**J. P. BOULEE**
United States District Judge